# United States Court of Appeals
## For the First Circuit

---

No. 99-1909

THE HOME INSURANCE COMPANY,

Plaintiff, Appellant,

v.

ST. PAUL FIRE & MARINE INSURANCE COMPANY, ET AL.,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, <u>U.S. District Judge</u>]

---

Before

Boudin, <u>Circuit Judge</u>

Bownes, <u>Senior Circuit Judge</u>

and Lynch, <u>Circuit Judge</u>.

---

<u>David A. Grossbaum</u>, with whom <u>Maura K. McKelvey</u> and <u>Cetrulo & Capone</u> were on brief, for appellant.
<u>Richard L. Suter</u>, with whom <u>Suter & Associates</u> was on brief, for appellee.

October 11, 2000

**LYNCH, Circuit Judge.**  In 1995, the Maine law firm of Smith & Elliott (S&E) was sued for malpractice.[1]  S&E held lawyers' professional liability insurance from both The Home Insurance Company and St. Paul Marine & Fire Insurance Company.  The Home defended the firm in the 1995 suit and eventually settled.  In the meantime, The Home brought this suit, seeking a declaration that St. Paul was obligated to share the costs of defending and indemnifying S&E.  The magistrate judge recommended granting summary judgment to St. Paul.  The district court affirmed the magistrate's recommended decision.  We reverse and remand with instructions.

## I.

In 1989, S&E represented a number of investors in the purchase and rehabilitation of a hotel in Kennebunk, Maine, called the Shawmut Inn.  The project fell through, and in 1995 the investors sued S&E for malpractice.  Investors Bernard F. Shadrawy, Jr. and Joseph D'Jamoos brought suit in early 1995.  Other investors Ralph Bruno, Port Resort Realty Corporation, and Harbor Lights Realty Trust brought a separate suit around November of the same year.  The costs of defending and

---

[1]    At the time when the events underlying this case began, S&E was known as Smith, Elliott, Smith & Garmey.  For the sake of simplicity, we use the firm's current name throughout this opinion.

settling the Bruno suit are the subject of the controversy in this case.

Initially, the Bruno suit was concerned solely with acts S&E committed in 1989, while representing the plaintiffs in the Shawmut Inn project. The Bruno plaintiffs charged that S&E failed to obtain a written loan commitment from the Bank of New England, and that consequently the Bank declined to honor its oral agreement to lend the plaintiffs $4 million in construction funds, causing the project's collapse. However, in February of 1996, in response to a motion to dismiss based on the statute of limitations, the Bruno plaintiffs amended their complaint, adding charges that in 1995 S&E breached various ethical duties owed to the Bruno plaintiffs. Specifically, the amended Bruno complaint alleged that in 1995, while S&E was defending itself in the two malpractice suits, S&E (1) disclosed the Bruno plaintiffs' files to Shadrawy and D'Jamoos without proper authorization; (2) wrongfully obtained a statement from Bruno for use in the Shadrawy suit; (3) contacted other prior counsel of the Bruno plaintiffs in an effort to obtain confidential information; and (4) refused to turn over the Bruno plaintiffs' files at their request.

The Home and St. Paul disagreed from the start over which

company was responsible for defending and indemnifying S&E in the Bruno suit. Both companies' policies were applicable, though for different reasons. The Home had issued S&E a lawyers' professional liability policy for the period of April 6, 1991 to April 6, 1992. St. Paul had issued S&E a similar policy for the period of April 6, 1995 to April 6, 1996. Each policy was a "claims made" policy as opposed to an "occurrence" policy: that is, each extended coverage to any claims made within the policy period, even if the acts on which those claims were based occurred prior to the policy period (though with important conditions, as will be seen). Thus, both policies potentially applied to claims that S&E committed malpractice in 1989, if such claims were made within the policies' respective periods. The Bruno claim clearly was made within St. Paul's 1995-1996 policy period: the suit was brought in or about November 1995. However, The Home had to treat the Bruno claim as if it had been made during The Home's 1991-1992 policy period as well. S&E was first threatened with a lawsuit in connection with the Shawmut Inn project in September of 1991, during The Home's policy period.[2] S&E reported the claim to The Home at the time. Thus, when the

---

[2] The suit was threatened by the Bank of New England. From the record, it appears that the Bank's threat never materialized.

Bruno claim was brought in 1995, The Home considered the claim to be related to the 1991 claim and so, under a provision in The Home's policy requiring The Home to treat related claims as the same claim, it had to treat the Bruno claim as if it had been made in 1991, during its policy period.[3]

The Home agreed to defend the Bruno suit, while fully reserving its rights. As for St. Paul, even though the Bruno suit was a claim made during its policy period, St. Paul initially disclaimed any obligation to defend or indemnify S&E; eventually, it agreed to provide coverage on an excess basis only, in the event that The Home's coverage was exhausted. For justification, St. Paul cited the "prior acts" provision of its policy, which stated that St. Paul would cover claims based on acts committed prior to the policy period only if "[a]ny other insurance covering the claim has been used up." In response, The Home pointed St. Paul to the "other insurance" provision in The Home's policy, which stated that, in general, if "other insurance" was available to pay for a claim covered by The Home's policy, The Home would cover

_____

[3] The relevant clause of The Home's policy reads: "Related acts, errors or omissions shall be treated as a single claim. All such claims, whenever made, shall be considered first made during the policy period . . . in which the earliest claim arising out of such act, error or omission was first made . . . ."

-6-

the claim on an excess basis only. Thus, each insurer concluded its policy was excess to the other. Seeking to split the difference, The Home sought to persuade St. Paul that The Home's "other insurance" clause and St. Paul's "prior acts" clause were mutually repugnant -- that is, the two cancelled each other out; therefore, under Maine law, the two insurers were obligated to split the costs of defending and indemnifying S&E on a pro rata basis. St. Paul disagreed and continued to deny concurrent coverage.

After the Bruno complaint was amended to include the allegations of ethical misconduct occurring in 1995, a further disagreement arose between the two insurers. The Home argued that these new claims and the acts upon which they were based both fell within St. Paul's policy period, and hence St. Paul was responsible for covering them. St. Paul disclaimed responsibility on the grounds that S&E was no longer representing the Bruno plaintiffs at the time the acts occurred, so the acts were not "committed in the performance of legal services" and thus did not fall under the literal terms of its policy.

Its attempts to persuade St. Paul through correspondence having failed, The Home filed the instant action on June 22, 1998. The Home sought a declaration that St. Paul provided

coverage as to the Bruno suit concurrently with The Home and was obligated to share costs accordingly. Six months later, The Home settled the Bruno suit. By this point, it had expended nearly $500,000 in defense and settlement of the case.[4]

After settling, The Home moved to amend its complaint to include the allegation that, because St. Paul breached its duty to defend S&E, St. Paul now bears the burden of proving how the Bruno settlement is to be apportioned as between S&E's 1989 acts and its 1995 acts; in particular, St. Paul must show that the settlement was not paid entirely to compensate for S&E's 1995 acts, for which The Home alleges St. Paul is exclusively responsible. Because this is an impossible burden to meet, the allegation continues, St. Paul must pay for the entire Bruno settlement.

The Home and St. Paul both moved for summary judgment. The magistrate recommended granting summary judgment to St. Paul. The magistrate ruled, first, that the St. Paul policy does not cover the 1995 acts alleged in the amended Bruno complaint because the acts were not "committed in the

---

[4] These expenses did not exceed The Home's $3 million policy limit, so it has never been claimed that St. Paul's obligations as an excess insurer were triggered by the Bruno suit.

performance of legal services."  Second, the magistrate ruled that The Home's "other insurance" clause and St. Paul's "prior acts" clause are not mutually repugnant, as contended by The Home; rather, The Home policy provides primary coverage while the St. Paul policy provides excess coverage.  Third, having found that St. Paul had no duty to defend S&E, the magistrate denied The Home's motion to amend its complaint on the grounds that the amendment would be futile.  The district court affirmed the magistrate's recommended decision in a paragraph order.  The effect was to leave The Home with all of the costs of defending and indemnifying S&E in the Bruno suit.  The Home now appeals.

## II.

We address the issues raised in the case in the following order: first, whether The Home's "other insurance" clause and St. Paul's "prior acts" clause are mutually repugnant, making the two insurers jointly responsible for defending and indemnifying S&E as to the 1989 acts alleged in the Bruno complaint; second, whether either insurer had a duty to defend or indemnify S&E as to the 1995 acts alleged in the Bruno complaint; and third, whether The Home should be granted leave to amend its complaint to demand that St. Paul pay the entire Bruno settlement.  Our review is de novo.  See Thomas v.

Eastman Kodak Co., 183 F.3d 38, 47 (1st Cir. 1999) (review of district court's decision on summary judgment is de novo), cert. denied, ___ U.S. ___, 120 S.Ct. 1174 (2000). Maine law governs.

A. Coverage of 1989 Acts

Although this case presents an apparently rare clash between an "other insurance" clause from one policy and a "prior acts" clause from another, it is in the end just a slight variation on the standard mutual repugnancy case in which two "other insurance" clauses conflict with one another. Accordingly, we begin our analysis by discussing the doctrine that applies to the standard case, and then we consider whether the variation presented here requires any deviation from this norm.

"Other insurance" clauses limit an insurer's responsibility for a claim if "other insurance" is available to cover it. Originally, the clauses appeared in property insurance policies and were intended to eliminate the problem of fraudulent claims induced by over-insuring. See Carriers Ins. Co. v. American Policyholders' Ins. Co., 404 A.2d 216, 218 (Me. 1979). In a context such as the one here, the clauses function not so much as to deter fraudulent claims as simply to limit an insurer's exposure where the insured

happens to hold multiple insurance policies covering the same loss. Cf. id.; see also R. J. Robertson, Jr., "Other Insurance" Clauses in Illinois, 20 S. Ill. U. L.J. 403, 405 (1996).

"Other insurance" clauses come in three types. The first, an "escape" clause, is the most basic: it simply denies any coverage for a claim if other insurance is available. The second, a "pro rata" clause, extends coverage to a portion of the total loss claimed, usually based on the limits of the applicable policies.[5] The third, an "excess" clause, is the type at issue in this case; it extends coverage only to the extent that other available insurance is insufficient to cover the claim.[6] See Carriers, 404 A.2d at 218.

"Other insurance" clauses are not necessarily problematic. For example, if a claim is covered by two policies each with pro rata clauses, then the insurers each pay a pro rata share of the claim. Or if one policy contains no "other insurance" clause at all while the second contains

---

[5] For example, if insurer A's policy limit is $1 million and insurer B's policy limit is $3 million, a pro rata clause in A's policy would require A to pay one-fourth of any claim covered by both A and B (up to $1 million).

[6] For example, if insurer A and B both cover a claim, and B's policy limit is $3 million, an excess clause in A's policy would require A to pay out on the claim only to the extent that the claim exceeded $3 million (up to A's policy limit).

an excess clause, then the first policy covers the claim and, if the first is insufficient, the second covers the excess. In these scenarios, both policies interact harmoniously and the claim goes wholly insured. But frequently, policies contain "other insurance" clauses that are incompatible in the sense that, if each is given full effect, claims covered by both policies will go under-insured. In particular, where two policies each contain excess "other insurance" clauses, giving effect to both will leave a claim completely uninsured. For the first policy provides coverage only in excess of the second, but the second provides coverage only in excess of the first; the result is a standoff, in which each insurer refuses to cover the claim before the other.

In order to break the tie in such situations, courts early on experimented with various rules for declaring one insurer the "primary" insurer and the other the "excess" insurer. One such rule was to consider the primary insurer to be the one "first in time"; a second rule considered the primary insurer to be the one whose "other insurance" clause was more general in scope; a third rule considered the primary insurer to be the one whose policy more specifically covered the claim at issue. See Carriers, 404 A.2d at 219 (collecting cases).

-12-

In time, however, most courts came to reject such rules, favoring instead the doctrine of mutual repugnancy, under which two insurers' excess clauses are thought to cancel each other out, and both insurers are made, in Solomonic fashion, to split the costs of coverage between them pro rata.  See 69 A.L.R. 2d 1122, 1124 (1960).  The Maine Supreme Judicial Court adopted this approach in Carriers, supra.  Finding the earlier rules "arbitrary," "mechanical," and tending toward "semantic microscopy," the court chose to "abandon[] the search for the mythical 'primary' insurer and insist[] instead that both insurers share in the loss."  Id. at 219-20.  Such an approach, the court explained, not only best carries out the intent of both insurers to limit their exposure, but also discourages insurers from engaging in draftsmanship battles and wasteful litigation in order to avoid providing primary coverage.  See id.

The essential difference between Carriers and this case is that here, the clash of clauses is not between two "other insurance" clauses, but rather is between an "other insurance" clause and a "prior acts" clause containing "other insurance" language.  Toward the end of The Home policy, in a section labeled "Conditions," which comes after a section labeled "Coverage," The Home's policy contains an "other insurance"

-13-

clause, which provides in pertinent part:

> **II. Other Insurance:** . . . [T]his insurance shall be in excess of . . . any other valid and collectible insurance available to the Insured whether such other insurance is stated to be primary, pro rata, contributory, excess, contingent or otherwise, unless such other insurance is written only as a specific excess insurance over the limits of liability provided in the policy.[7]

In contrast, near the middle of St. Paul's policy, under a section labeled "When This Agreement Covers," is St. Paul's "prior acts" clause, specifying under what conditions St. Paul will cover claims based on acts committed prior to the policy period. It provides as follows:

> **Prior acts.** We'll cover claims based on wrongful acts that occurred before the effective date of this agreement, but only if all the following conditions are met: . . .
>
> •  Any other insurance covering the claim has been used up.

There is no question that if the "other insurance" language of St. Paul's "prior acts" clause had instead appeared in a catchall "other insurance" clause such as the one in The Home policy, the two insurers would be required to share coverage

---

[7]  By "specific excess insurance" is meant insurance providing coverage only in excess of some other specifically identified policy -- which here would be The Home policy. See Wright v. Newman, 598 F. Supp. 1178, 1196 (W.D. Mo. 1984), aff'd, 767 F.2d 460 (8th Cir. 1985). St. Paul's policy is not of this sort; there is no dispute that, if The Home policy did not exist, St. Paul's policy would provide coverage as to S&E's 1989 acts.

under Carriers.  The question, then, is whether it makes any difference that the language appears in the "prior acts" clause.

The magistrate judge held that it does, and that Maine's usual mutual repugnance rule therefore does not apply.  The magistrate found only four cases -- none of them from Maine -- bearing precisely on the question, and of these four, three found no mutual repugnance.  See Evanston Ins. Co. v. Affiliated FM Ins. Co., 556 F. Supp. 135, 138 (D. Conn. 1983) (finding no mutual repugnance); Smith v. Neumann, 682 N.E.2d 1245, 1251-52 (Ill. App. Ct. 1997) (same); Chamberlin v. Smith, 72 Cal. App. 3d 835, 850-51 (Cal. Ct. App. 1977) (same); Fremont Indem. Co. v. New England Reinsurance Co., 815 P.2d 403, 407-08 (Ariz. 1991) (finding mutual repugnance). Following the guidance of this "meagre but distinct majority," the magistrate judge reasoned as follows: The Home's "other insurance" clause appears after the coverage section of its policy, whereas the "other insurance" language in St.Paul's "prior acts" clause appears within the coverage section of its policy; consequently, under The Home's policy, coverage for S&E's 1989 acts is initially triggered in the coverage section and only rescinded if the "other insurance" clause later kicks in, while under St. Paul's policy, coverage is never triggered

-15-

in the first place; so, because St. Paul's coverage is never triggered, The Home's "other insurance" clause never kicks in, its coverage is never rescinded, and The Home is left as the primary insurer.  Put succinctly, the magistrate found that St. Paul's "prior acts" clause effects "not a post hac escape clause, but rather an explicit, initial exclusion from coverage," Evanston, 556 F. Supp. at 138, and, for that reason, it trumps The Home's "other insurance" clause.

We think such reasoning turns too much on the sort of "semantic microscopy" that the Maine Supreme Judicial Court disfavored in Carriers; to accept it would encourage the very draftsmanship battles and wasteful litigation that the Carriers Court sought to prevent.  Simply because The Home's "other insurance" clause appears outside a section expressly labeled "Coverage" does not mean that coverage is not limited by the provision, or that the provision should be given any less weight than if it appeared inside such a section.  Nor is it correct to conceive of St. Paul's policy as "initially" excluding coverage, or The Home's policy as initially extending it and only later attempting taking it away, as if one section of an insurance policy were metaphysically prior to another.  Under Maine law the coverage provided by an insurance policy is determined by the policy as a whole.  "All

-16-

parts and clauses, including exceptions and conditions, must be considered together . . . ." Baybutt Constr. Corp. v. Commercial Union Ins. Co., 455 A.2d 914, 921 (Me. 1983), overruled on other grounds by Peerless Ins. Co. v. Brennon, 564 A.2d 383 (Me. 1989). Read as a whole, The Home's policy covers claims only on an excess basis if other insurance is available; St. Paul's policy does the same where the claims are based on prior acts. Thus, each policy purports to provide only excess coverage for S&E's 1989 acts if the other policy is available. In such a situation, Carriers demands proration. We do not think Carriers countenances different outcomes depending on whether St. Paul's language was in an "other insurance" clause relating to prior acts or in a "prior acts" clause relating to other insurance. Such an approach would tend to encourage insurers to jockey for best position in choosing where to locate "other insurance" language, needlessly complicating the drafting of policies, inducing wasteful litigation among insurers, and delaying settlements -- all ultimately to the detriment of the insurance-buying public. See Fremont, 815 P.2d at 407; cf. Carriers, 404 A.2d at 220.

The magistrate judge thought that the Maine Supreme Judicial Court "would not be so quick to collapse the

-17-

distinction between the coverage portions of a policy and a catchall 'other insurance' clause."  For support, it cited the Maine Supreme Judicial Court's decision in <u>Royal Globe Insurance Co.</u> v. <u>Hartford Accident & Indemnity Co.</u>, 485 A.2d 242 (Me. 1984).  There, the Court found no mutual repugnance where one policy contained a catchall "other insurance" clause and the other contained a clause making coverage for the insured's employees (but not for the insured itself) available on an excess basis only.  <u>Royal Globe</u>, 485 A.2d at 243-44. The magistrate judge drew an analogy with the instant case: "Just as the . . . insurer in <u>Royal Globe</u> extended coverage in a specific instance (involving employees) only upon exhaustion of other available insurance, St. Paul extends coverage in a specific instance (involving prior acts) only upon such exhaustion."

There are several problems with this analogy.  As an initial matter, the analogy does not support the posited thesis -- that St. Paul's "prior acts" clause trumps The Home's "other insurance" clause because of its location in the coverage portions of St. Paul's policy.  Indeed, <u>Royal Globe</u> does not mention the location of the clauses at issue there. Rather, what the analogy seems to suggest is that St. Paul's "prior acts" clause trumps The Home's "other insurance" clause

-18-

because it applies more specifically to the claim at issue here -- i.e., it applies specifically to claims based on prior acts, whereas The Home's "other insurance" clause applies to claims generally.

The difficulty is that such a conclusion is flatly at odds with Carriers, which explicitly rejected the rule that, as between two "other insurance" clauses, the specific trumps the general. Carriers, 404 A.2d at 219. There is no reason to think that Royal Globe revives this rule. Indeed, Royal Globe is distinguishable from both Carriers and this case in that it involved a conflict not between two excess "other insurance" clauses, but rather between an excess clause and a pro rata clause. Courts treat conflicts between two excess clauses differently from conflicts between an excess clause and a pro rata clause: while the majority rule for the former is to apply the doctrine of mutual repugnance, the majority rule for the latter is that the excess clause trumps the pro rata clause. Compare 69 A.L.R.2d 1122, 1124 (1960) (describing majority rule for excess vs. excess cases) with 12 A.L.R.4th 993, 997 (1982) (describing majority rule for excess vs. pro rata cases); see also Robertson, supra, at 414, 418. Thus, the more straightforward reading of Royal Globe -- and the reading more compatible with Carriers -- is simply that it

-19-

adopts the majority rule for conflicts between excess clauses and pro rata clauses. See Royal Globe, 485 A.2d at 244-45 (finding pro rata clause not a clear indicator of whether policy is primary or excess, so, by default, policy with pro rata clause is to be considered primary).

Finally, St. Paul asks us to consider expert testimony regarding how conflicts between successive insurers, such as the conflict in this case, are settled within the industry. Perhaps in some other setting it might be appropriate to consider such evidence, but we do not think it would be appropriate here. The relevant policy language is unambiguous and the dispute presented can be resolved through ordinary judicial methods of contractual interpretation. See Hanover Ins. Co. v. Crocker, 688 A.2d 928, 930 (Me. 1997) ("In cases involving the construction of the language of an insurance contract, the meaning of unambiguous language is a question of law."). Moreover, the expert testimony presented by St. Paul is ultimately irrelevant. The testimony was that within the insurance industry, if one insurer was on risk at the time an act occurred, and the other was on risk at the time a claim based on the act was made, the former insurer is expected to cover the claim on a primary basis. However, The Home was not on risk at the time the 1989 acts alleged in the Bruno

complaint occurred. The only reason The Home's policy covers the Bruno claim is that The Home was on risk in 1991, when the first claim against S&E based on the 1989 acts was reported; because the Bruno claim relates back to this claim, The Home's policy provides coverage.

In conclusion, seeing no reason to consider St. Paul's "prior acts" clause to trump The Home's "other insurance" clause, we find the two clauses mutually repugnant. Accordingly, St. Paul is responsible for a pro rata share of the costs of defending and indemnifying S&E as to the 1989 acts alleged in the Bruno complaint.

B. Coverage of 1995 Acts

We next consider whether St. Paul had a duty to defend and indemnify S&E as to the 1995 acts -- the breaches of ethical duties -- alleged in the amended Bruno complaint. The Home contends that these allegations constitute a separate claim from the allegations based on S&E's 1989 acts, and that The Home is not responsible for this claim because it is based on acts that occurred neither prior to nor during its policy period. Rather, The Home argues, the 1995 acts occurred and the claim based upon them was made during St. Paul's policy period, so St. Paul is exclusively responsible for providing coverage. St. Paul responds, first, that its policy does not

cover the 1995 acts because none qualify as "a negligent act, error, or omission committed in the performance of legal . . . services," and second, that The Home's policy does cover the 1995 acts because they sufficiently relate to the 1989 acts, for which The Home concedes coverage.[8]

There are two questions to be decided: first, whether either insurer had a duty to defend as to the 1995 acts, and second, whether either insurer had a duty to indemnify. See Lewiston Daily Sun v. Hanover Ins. Co., 407 A.2d 288, 291-92 (Me. 1979) (comparing duty to defend with duty to indemnify); American Policyholders' Ins. Co. v. Cumberland Cold Storage Co., 373 A.2d 247, 250-51 (Me. 1977) (same).

1. Duty to Defend

Under Maine law, "[t]he scope of a duty to defend is determined by 'comparing the provisions of the insurance contract with the allegations in the underlying complaint. If there is any legal or factual basis that could be developed at trial, which would obligate the insurer to pay under the policy, the insured is entitled to a defense.'" Burns v.

_____

[8] The magistrate judge agreed with St. Paul that the 1995 acts were not "committed in the performance of legal . . . services." Rather, he found, the acts were committed in the course of S&E's conduct as a defendant in a malpractice case. The magistrate judge made no finding as to whether The Home's policy covered the 1995 acts.

Middlesex Ins. Co., 558 A.2d 701, 702 (Me. 1989) (quoting

J.A.J., Inc. v. Aetna Cas. & Sur. Co., 529 A.2d 806, 808 (Me.

1987)) (emphasis in original); see also United Bank v. Chicago

Title Ins. Co., 168 F.3d 37, 39 (1st Cir. 1999).  Maine law

favors an expansive view of an insurer's duty to defend; any

ambiguity in policy language is to be construed in favor of

the insured.  See Union Mut. Fire Ins. Co. v. Inhabitants of

Topsham, 441 A.2d 1012, 1015 (Me. 1982).

Given that Maine has so placed its thumb on the scales,

we think that St. Paul most likely had a duty to defend S&E as

to the 1995 acts.  St. Paul's primary argument is that the

acts occurred after S&E had ceased representing the Bruno

plaintiffs, and so the acts cannot be said to have been

"committed in the performance of . . . legal services," as its

policy requires.[9]  We think it at least arguable, however,

that a lawyer's honoring of his continuing ethical duties,

arising as they do out of the attorney-client relationship, is

itself a "legal service" the lawyer provides to his clients,

see Regas v. Continental Cas. Co., 487 N.E.2d 105, 109 (Ill.

App. Ct. 1985) (construing "services" in legal malpractice

---

[9]     The policy states in pertinent part: "We'll pay amounts you . . . are legally required to pay to compensate others for loss that results from a negligent act, error, or omission committed in the performance of legal or notary services."

-23-

policy to encompass "any sort of service . . . [that] requires the use of any degree of legal knowledge or skill") (citations omitted), and that the 1995 acts could, under some legal theory or factual showing, each be proven a "negligent act, error, or omission" committed in the performance of such service, see Travelers Indem. Co. v. Dingwell, 414 A.2d 220, 226 (Me. 1980) ("The correct test is whether a potential for liability within the coverage appears from whatever allegations are made.") (emphasis in original).[10]

In the end, though, we need not resolve the question. We have already concluded that St. Paul had a duty to defend S&E as to the 1989 acts alleged in the Bruno complaint. And under Maine law, if an insurer has a duty to defend against one

_____

[10]    St. Paul objects that the Bruno plaintiffs could never have proven the 1995 acts to constitute error because Maine Bar Rule 3.6(h)(3) permits a lawyer to disclose a client's confidential information if necessary to defend himself in a malpractice suit.  We note first that this provision would excuse only one of the 1995 acts -- S&E's disclosure of the Bruno's files to others.  Second, it was possible that the Bruno plaintiffs could have proven at trial that this disclosure was not reasonably necessary to S&E's malpractice defense and so was wrongful notwithstanding Rule 3.6(h)(3).  St. Paul further objects that the 1995 acts were all intentional in nature, and so do not fall under the scope of its coverage, which is for loss resulting from a "negligent act, error, or omission."  But, given Maine's policy of resolving ambiguities in favor of the insured, we do not think this language should be read so narrowly.  See USM Corp. v. First State Ins. Co., 652 N.E.2d 613, 614-15 (Mass. 1995) (collecting cases for reading "negligent" to modify only the term "act," not "error" or "omission").

count of a complaint, it has a derivative duty to defend against other counts if they are sufficiently related that apportioning defense costs as between the two is not practicable. See Gibson v. Farm Family Mut. Ins. Co., 673 A.2d 1350, 1353 (Me. 1996). This is the majority rule. See Titan Holdings Syndicate, Inc. v. Keene, 898 F.2d 265, 269 (1st Cir. 1990) (citing 41 A.L.R.2d 434, 436-38 (1980 Supp.) (collecting cases)). In this case, the allegations of the 1995 acts are sufficiently intertwined with the allegations of the 1989 acts so that The Home's defense costs cannot readily be retrospectively apportioned as between the two. The 1995 acts arose out of the same attorney-client relationship and ultimately relate back to the same botched real estate transaction as the 1989 acts; defending against allegations of the former required knowledge of the latter. Cf. Gibson, 673 A.2d at 1354. Moreover, as discussed below, S&E's defense as to the 1995 acts was merely incidental to its defense as to the 1989 acts. The great bulk of the Bruno suit concerned the 1989 acts; the allegations of the 1995 acts were defended against merely in order to prevent the Bruno plaintiffs from escaping a statute of limitations problem affecting the allegations of the 1989 acts. Given these circumstances, St. Paul had a duty to defend as to the 1995 acts as well as the

-25-

1989 acts, regardless of whether the 1995 acts independently fall within its coverage.

For its part, The Home appears to concede that, under Gibson, supra, it was obliged to defend as to the 1995 acts as well as the 1989 acts. Only with respect to the duty to indemnify as to the 1995 acts does The Home claim that such duty was St. Paul's alone. Thus, given that The Home and St. Paul were both obliged to defend against the 1989 allegations, we hold that both insurers had a derivative duty to defend against the 1995 allegations. St. Paul therefore must share with The Home the costs of defending the entire Bruno suit, not merely the costs of defending against the allegations of the 1989 acts.

2. Duty to Indemnify

In contrast to the duty to defend, the duty to indemnify is narrower: while the duty to defend depends only on the allegations made against the insured, the duty to indemnify depends upon the facts established at trial and the theory under which judgment is actually entered in the case. Cumberland Cold Storage, 373 A.2d at 250. However, the Bruno suit was settled prior to trial, so no facts were ever established nor judgment ever entered in the case. In such a situation, this court has held, the duty to indemnify is

determined by the basis for the settlement.  See Travelers

Ins. Co. v. Waltham Indus. Labs. Corp., 883 F.2d 1092, 1099

(1st Cir. 1989).  Accordingly, whether St. Paul or The Home

had a duty to indemnify S&E as to the 1995 acts turns on

whether any portion of the settlement was made in compensation

for the 1995 acts, and, if so, whether the 1995 acts fall

under either insurer's coverage.

We again avoid answering the latter question, for we

think it is clear from the record that the Bruno settlement

was made entirely in compensation for the 1989 acts; no

significant portion was directed to the 1995 acts.  The Bruno

complaint, as originally filed, alleged only the 1989 acts;

those acts were the raison d'etre for the suit.  The complaint

was amended to include the 1995 allegations only after S&E

moved to dismiss the original complaint on statute of

limitations grounds.  In its motion to strike the amended

Bruno complaint and its subsequent motion for summary judgment

in the case, S&E made clear that it considered the added

allegations frivolous, in violation of Rule 11, and intended

solely as an end run around the statute of limitations.  From

a correspondence file kept on the case, it appears that the

1995 acts were not even considered by S&E's defense team in

analyzing the case's settlement value.  Likewise, the Bruno

-27-

plaintiffs did not consider the allegations of the 1995 acts to carry any significant value relative to the allegations of the 1989 acts. In assessing their damages in a motion for attachment filed in the case, the plaintiffs focused entirely on the damages caused by the 1989 acts; they did not so much as mention the 1995 acts. The same is true of Ralph Bruno's enumeration of his losses in an affidavit he submitted in the case. The only evidence in the record that plaintiff Bruno considered the 1995 acts to have caused any damages appears in his answers to an interrogatory directly posing the question. Bruno stated vaguely that the files that S&E disclosed to others contained embarrassing material and that S&E's failure to turn the files over to him made it harder for his lawyers to conduct the Bruno case, increasing his legal fees. By comparison, the Bruno plaintiffs described in comprehensive detail various tangible losses they suffered as a result of the 1989 acts. According to the plaintiffs, those losses totaled approximately $29 million. The settlement, plus The Home's attorney's fees, totaled about $500,000.

We thus find no genuine issue of material fact concerning the apportionment of the Bruno settlement. Compared to a failed real estate transaction in which the Bruno plaintiffs lost millions, S&E's alleged acts of mischief in the resulting

malpractice actions -- the improper handling of a file, the improper taking of a statement, and the improper contacting of a former attorney -- appear entirely inconsequential. It simply cannot be seriously contended -- especially given the circumstances under which the acts were alleged -- that anything more than a de minimis portion of the Bruno settlement could have been intended to compensate for the 1995 acts. Accordingly, we hold that neither The Home nor St. Paul had a duty to indemnify S&E as to the 1995 acts, so St. Paul owes The Home nothing for indemnifying as to the 1995 acts. Nonetheless, St. Paul still owes The Home for all of its indemnification costs, because the whole of the Bruno settlement, and so all of The Home's indemnification costs, related to the 1989 acts.

C. Motion to Amend

Finally, we address The Home's motion to amend its complaint. The Home moved to amend its complaint after settling the Bruno action, seeking to raise a new theory of liability based on St. Paul's refusal to participate in the settlement. The theory is as follows. Under Maine law -- or so The Home argues -- if an insurer breaches its duty to defend a suit, and the suit settles, then the insurer bears the burden of allocating the settlement and proving that at

least some of the settlement was paid for claims that its policy does not cover.[11]  Yet, the argument continues, because the settlement agreement in the Bruno case does not specify how the settlement was intended to be allocated, St. Paul's burden of allocating the settlement is impossible to carry. Consequently, St. Paul cannot prove that the settlement was not paid entirely for the 1995 acts, as to which The Home alleges St. Paul alone had a duty to indemnify.  Therefore, supposing The Home is correct that St. Paul alone had a duty to indemnify as to the 1995 acts, it must be assumed that the settlement was paid entirely for those acts, in effect rendering St. Paul responsible for the whole settlement.

The magistrate dismissed The Home's motion to amend on futility grounds, because it rejected the premise of The Home's theory that St. Paul had an exclusive duty to indemnify S&E as to the 1995 acts.  We similarly reject that premise.[12] Obviously, given our holding in the previous section, we

_____

[11]    The Home cites Elliott v. Hanover Ins. Co., 711 A.2d 1310, 1313-1314 (Me. 1998) (citing Polaroid Corp. v. Travelers Indem. Co., 610 N.E.2d 912, 922 (Mass. 1993)), as the relevant authority.  St. Paul argues that the citation does not support The Home's argument.  Because we do not take up The Home's argument, we do not weigh in on this dispute.

[12]    We reject it, however, for different reasons. As noted earlier, the magistrate judge held that St. Paul had no duty to indemnify as to the 1995 acts because the acts did not fall within the scope of St. Paul's coverage.

-30-

disagree with The Home that, merely because the Bruno settlement agreement does not itself describe how the settlement was allocated as between the 1989 acts and 1995 acts, there is no way to prove that the settlement was not paid entirely for the 1995 acts. To the contrary, we think that evidence extrinsic to the settlement agreement shows conclusively that the settlement was paid entirely for the 1989 acts. Accordingly, we reject The Home's proposed theory and do not disturb the magistrate's dismissal of The Home's motion to amend. See Demars v. General Dynamics Corp., 779 F.2d 95, 99 (1st Cir. 1985).

### III.

We briefly summarize our holding. First, we find The Home's "other insurance" clause and St. Paul's "prior acts" clause to be mutually repugnant; consequently, both insurers had a duty to defend and indemnify S&E as to the 1989 acts. Second, we find that both insurers had a derivative duty to defend S&E as to the 1995 acts; by contrast, we find that neither insurer had a duty to indemnify as to the 1995 acts, but only because no portion of the Bruno settlement was allocated to those acts. The effect is that St. Paul is obligated to reimburse The Home for a pro rata share of all of its defense and indemnification costs. To that extent,

-31-

summary judgment should be granted to The Home.  We reverse

and remand for proceedings consistent with this opinion.