[No. H026360. Sixth Dist. Jan. 12, 2005.]

CARMEL DEVELOPMENT COMPANY, Plaintiff, v.
RLI INSURANCE COMPANY, Defendant, Cross-Complainant and
Appellant. FIREMAN'S FUND INSURANCE COMPANY, Intervenor and
Respondent.

## Counsel

Sedgewick, Detert, Moran & Arnold and Julia A. Molander for Defendant, Cross-Complainant and Appellant.

Lombardi, Loper & Conant, Ralph A. Lombardi and Lori A. Sebransky for Intervenor and Respondent.

## OPINION

**ELIA, Acting P. J.**—This appeal arises from a dispute between excess insurers of comprehensive general liability. The trial court ruled that appellant RLI Insurance Company (RLI) and respondent Fireman's Fund Insurance Company (Fireman's Fund) insured the same risk and had competing "other insurance" clauses. It therefore ordered RLI to contribute to Fireman's Fund's settlement of a personal injury lawsuit against the insured.

On appeal, RLI contends that it was not obligated to contribute to the settlement on an equal basis with Fireman's Fund because the insuring agreement in its policy made it excess to the coverage Fireman's Fund provided. We find merit in RLI's argument and must therefore reverse the judgment.

### Background

The facts of the underlying lawsuit are undisputed and need be recounted only briefly. Carmel Development Company (Carmel) was the general contractor on a project to construct golf and residential facilities in Monterey County. For the concrete work Carmel subcontracted with Largo Concrete Company (Largo), which in turn subcontracted with CAB Concrete (CAB) for a portion of the work. On January 13, 1999, Abel Vargas, a CAB employee, was severely injured on the work site. In April 1999 he and his wife sued both Carmel and Largo. Largo settled with the Vargases, but Carmel proceeded to trial. A jury subsequently awarded Mr. and Mrs. Vargas a total of $10,569,242 in damages.[1]

Carmel had a commercial general liability (CGL) policy issued by Reliance Insurance Company (Reliance), as well as a $10 million excess liability policy from Fireman's Fund. Largo had a primary CGL policy with Acceptance Insurance Company (Acceptance) and a commercial umbrella policy with RLI. Reliance and Fireman's Fund settled the Vargas action for $7.25 million, with Reliance paying its policy limits of $1 million and Fireman's Fund paying $6.25 million.

Carmel then sued Acceptance and RLI, seeking a judicial determination that it was an additional insured under the Acceptance policy and that RLI, as excess insurer, was obligated to contribute to the Vargas settlement after the Acceptance limits were met. Fireman's Fund joined in Carmel's allegations by intervening in the action. RLI filed a cross-complaint against Carmel, Fireman's Fund, and Reliance.

---

[1] Of this amount the jury found Carmel 87.5 percent at fault, Largo 8 percent at fault, and CAB 4 percent at fault.

At trial Fireman's Fund contended that it and RLI were both excess insurers, whose policies contained irreconcilable "other insurance" clauses. RLI maintained that its policy was "second level excess," which applied "only when all other insurance exhausts, including the Fireman's Fund policy."

The trial court found that Carmel was an additional insured under the Acceptance and RLI policies issued to Largo. As excess insurers, both Fireman's Fund and RLI were obligated to provide coverage when their respective underlying carriers, Reliance and Acceptance, had exhausted their policy limits. Because RLI and Fireman's Fund had competing excess-only "other insurance" clauses, the court found it appropriate to require them both to contribute to the settlement amount. The court accordingly allocated the parties' payment obligations in proportion to their policy limits, resulting in RLI's duty to contribute $2,083,333 to the settlement.[2]

*Discussion*

1. *Scope of Review*

■ The sole issue before us is whether the trial court correctly interpreted the terms of the Fireman's Fund and RLI policies such that equitable contribution was appropriate. This question calls for an interpretation of the policy terms, which is, as with any other contract, a matter of law to be reviewed de novo on appeal. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619]; *Continental Ins. Co. v. Lexington Ins. Co.* (1997) 55 Cal.App.4th 637, 642 [64 Cal.Rptr.2d 116].) Accordingly, the policy "must be construed as an entirety, with each clause lending meaning to the other." (*Holz Rubber Co., Inc. v. American Star Ins. Co.* (1975) 14 Cal.3d 45, 56 [120 Cal.Rptr. 415, 533 P.2d 1055].) Whether the court properly applied equity in prorating the parties' indemnity obligations, a matter of judicial discretion (*Centennial Ins. Co. v. United States Fire Ins. Co.* (2001) 88 Cal.App.4th 105, 111–112 [105 Cal.Rptr.2d 559]), is not at issue in this appeal.

2. *Principles of Equitable Contribution*

■ When two insurers cover the same level of liability (e.g., both primary or both excess) on the same risk as to the same insured, courts may require each to contribute to the cost of defending the claim or indemnifying

---

[2] Fireman's Fund had a policy limit of $10 million, while RLI's policy limit was $5 million. The court applied a 2:1 ratio to their contribution obligations, thus assigning RLI one third of the $6.25 million settlement.

the loss. (*Maryland Casualty Co. v. Nationwide Mutual Ins. Co.* (2000) 81 Cal.App.4th 1082, 1089 [97 Cal.Rptr.2d 374]; *Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1079, fn. 6 [124 Cal.Rptr.2d 142, 52 P.3d 79].) As explained in *Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1293 [77 Cal.Rptr.2d 296], "[T]he right to contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others. . . . Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was *equally* and *concurrently* owed by the other insurers and should be shared by them pro rata in proportion to their respective coverage of the risk. The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others." (Accord, *Travelers Casualty and Surety Co. v. Century Surety Co.* (2004) 118 Cal.App.4th 1156, 1160 [13 Cal.Rptr.3d 526].)

■ In determining whether these equitable principles apply to two insurers at the same level, courts often compare the "other insurance" clauses of the policies. " 'Most insurance policies contain "other insurance" clauses that attempt to limit the insurer's liability to the extent that other insurance covers the same risk. Such clauses attempt to control the manner in which each insurer contributes to or shares a covered loss. . . .' [Citation.]" (*Travelers Casualty & Surety Co. v. American Equity Ins. Co.* (2001) 93 Cal.App.4th 1142, 1149 [113 Cal.Rptr.2d 613].) Although courts honor coverage terms, including "other insurance" clauses, whenever possible, "where the policies of two or more insurers of a common insured, providing [the same level of] coverage for the same risk, contain conflicting 'other insurance' clauses . . . if one insurer pays more than its share of the loss or defense costs without participation from the other insurer or insurers, a right to contribution arises." (*Travelers Casualty & Surety Co. v. Century Surety Co., supra,* 118 Cal.App.4th at p. 1160, citing *Fireman's Fund Ins. Co. v. Maryland Casualty Co., supra,* 65 Cal.App.4th at p. 1293; see also *CSE Ins. Group v. Northbrook Property & Casualty Co.* (1994) 23 Cal.App.4th 1839, 1842 [29 Cal.Rptr.2d 120] ["when two 'excess-only' other-insurance clauses collide, the courts will force both carriers to prorate, in derogation of the policy language"].)

■ Even when one "other insurance" clause provides for pro rata coverage while the other purports to be excess only, courts generally favor proration, because the prevailing judicial view is that imposing the entire liability for a loss on the former "would annul that policy's language, and create the anomaly that courts will . . . enforce proration between policies [only] when they [both] have conflicting 'excess other insurance' language *barring* proration." (*Fireman's Fund Ins. Co. v. Maryland Cas. Co.* (1998) 65

Cal.App.4th 1279, 1306 [77 Cal.Rptr.2d 296]; *Century Surety Co. v. United Pacific Ins. Co.* (2003) 109 Cal.App.4th 1246, 1258 [135 Cal.Rptr.2d 879].) "Giving 'excess other insurance' clauses priority over policies providing for pro rata apportionment of liability among policies is completely unrelated to the original historical purpose of such 'other insurance' clauses, which was to prevent multiple recoveries by *insureds* in cases of overlapping insurance policies providing coverage for the same loss. For these reasons, among others . . . '[t]he general rule, when multiple polices share the same risk but have inconsistent "other insurance" clauses, is to prorate according to the policy limits.' [Citation.]" (*Fireman's Fund Ins. Co. v. Maryland Cas. Co., supra,* 65 Cal.App.4th at p. 1306; accord, *Century Surety Co. v. United Pacific Ins. Co., supra,* 109 Cal.App.4th at p. 1258.)

### 3. *Applicability of Equitable Contribution*

In this case each of the policies at issue included an "other insurance" clause purporting to be excess over other available insurance. The "Conditions" section of Fireman's Fund's policy stated, "OTHER INSURANCE. [¶] If there is any (1) **Other Insurance** . . . this policy shall apply as excess of and not contributory with such Insurance." "Other insurance" was defined as "Insurance, other than Primary Insurance or Insurance which is specifically purchased by the Named Insured to be in excess of the Insurance afforded by this policy, which is available to the Insured and affords coverage for Injury or damage to which this policy applies." RLI's "Other Insurance" condition stated, "Whenever the **insured** is covered by other primary, excess or excess-contingent insurance not scheduled on this policy as **scheduled underlying insurance**, this policy shall apply only in excess of, and will not contribute with, such other insurance. This policy shall not be subject to the terms, conditions or limitations of such other insurance."

The trial court found these two clauses to be in irreconcilable conflict, thereby necessitating the parties' contribution on a pro rata basis. Were we to limit our analysis on appeal to these provisions, we would uphold the trial court's decision, because both clauses do purport to be excess over each other and RLI does not contest the court's exercise of discretion. In our analysis, however, we will not read these provisions in isolation. Instead, we must first address the underlying premise that the parties provided the same level of coverage. This question requires a broader examination of each policy to ascertain the context in which the "other insurance" provisions appeared. Only if the two policies were insuring the same risk at the same level of coverage will we proceed to determine whether the "other insurance" clauses conflicted and thus required equitable proration. (See *Reliance Nat. Indemnity Co. v. General Star Indemnity Co.* (1999) 72 Cal.App.4th 1063, 1077 [85 Cal.Rptr.2d 627] ["other insurance" clauses become relevant only when

several insurers insure the same risk at the same level of coverage]; *Travelers Casualty & Surety Co. v. American Equity Ins. Co., supra*, 93 Cal.App.4th 1142, 1150 [same]; see also *Commerce & Industry Ins. Co. v. Chubb Custom Ins. Co.* (1999) 75 Cal.App.4th 739, 745 [89 Cal.Rptr.2d 415] [predicate for prorating policies with conflicting "other insurance" provisions is that they operate on the same level of coverage]; accord, *Century Surety Co. v. United Pacific Ins. Co., supra*, 109 Cal.App.4th at p.1256.) We therefore turn to the insuring language of each policy.

The insuring clause of the Fireman's Fund policy stated, "Subject to the other provisions of this policy, **We** will pay on behalf of the **Insured** those sums in excess of **Primary Insurance** that the **Insured** becomes legally obligated to pay as damages. The amount **We** will pay for damages is limited as described in SECTION III-LIMITS OF INSURANCE."[3] Thus, Fireman's Fund clearly provided a policy specifically excess to that of the primary insurer, which was defined as Reliance.

RLI's insuring agreement promised, "subject to the terms, conditions and exclusions of this policy," to pay "all sums which the **insured** becomes legally obligated to pay as **ultimate net loss**, because of: [¶] A. **Bodily injury** and **property damage**; or [¶] B. **Personal injury**; or [¶] C. **Advertising injury** caused by an **occurrence** which takes place during the policy period . . . ." Under the next paragraph, "LIMITS OF LIABILITY," RLI stated that it would be liable only "for the **ultimate net loss** in **excess of**: [¶] 1. the applicable limits of **scheduled underlying insurance** stated in Item 5 of the Declarations, for **occurrences** covered by **scheduled underlying insurance**, plus the limits of any **unscheduled underlying insurance** which also provides coverage for such **occurrences** . . . ."

The boldfaced terms were defined in a subsequent section. "**Ultimate net loss**" represented the amount for which the insured was liable "after deducting for all other recoveries and salvages," and it excluded certain payments, fees, and expenses. The term "**scheduled underlying insurance**" referred to the policies listed in the "Schedule of Underlying Insurance," which (for comprehensive general liability) meant the policy issued by Acceptance. The term "**unscheduled underlying insurance**" was defined as "any insurance policies available to any **insured** (whether primary, excess, excess-contingent, or otherwise) except the policies listed in the Schedule of Underlying Insurance."

It is apparent from the language of these basic insuring provisions that RLI and Fireman's Fund did not place themselves in the same position with

---

[3] The "Limits of Insurance" section explained the limits for "each occurrence" and for the aggregate amount covered.

respect to other carriers. Fireman's Fund undertook to provide coverage immediately upon exhaustion of Reliance's policy limits, whereas RLI obligated itself to step in only when the limits of *both* the Acceptance policy and *all other* available coverage—primary and excess—were exceeded.

Fireman's Fund, however, points out that its agreement to pay the "excess of Primary Insurance" was expressly made "subject to the other provisions of this policy." Fireman's Fund argues that through this conditional language the policy incorporated the "other insurance" clause, thereby making it, like the RLI policy, excess to both scheduled and unscheduled insurance. The plain language of the Fireman's Fund agreement, however, provided coverage to the insured upon exhaustion of the Reliance policy limits. Its insuring language did not clearly and unequivocally inform the insured that it was excess over *all* other insurance, primary and excess, but buried its limitation on the second to the last page in a generally worded "other insurance" clause, a condition generally accorded judicial disfavor. (*Dart Industries, Inc. v. Commercial Union Ins. Co.*, *supra*, 28 Cal.4th at p. 1080.)

RLI's policy was more explicit in its limitations. Its "Limits of Liability" paragraph, set forth on the first page of the policy, clearly made RLI's coverage excess over scheduled *and* unscheduled underlying insurance. "Unscheduled underlying insurance" refers not only to unscheduled *primary* insurance, but also to *excess* policies. Its "other insurance" clause reinforced this limitation: It asserted its role as excess over "other primary, excess or excess-contingent insurance not scheduled on this policy as scheduled underlying insurance."

Fireman's Fund maintains that the insuring limitation in RLI's policy should be disregarded as "duplicative" of its "other insurance" clause. We agree with RLI that such an approach would entail reading the policy backwards, as if the principal statement of coverage were the "other insurance" clause. The insuring limitation in the RLI policy is part of the insurer's basic undertaking of risk, not a repetition of a condition that does not appear until 10 pages after the basic insuring provisions. (Cf. *Waller v. Truck Ins. Exchange, Inc.*, *supra*, 11 Cal.4th 1, 16 [before considering exclusions, court must examine the coverage provisions to determine whether a claim falls within policy terms].) Furthermore, in construing an insurance agreement we must avoid interpretations that would create redundancy in policy language. (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 827 [274 Cal.Rptr. 820, 799 P.2d 1253].) We therefore reject Fireman's Fund's dismissal of this material insuring provision as "simply a redundancy."

Contractual terms of insurance coverage are enforced whenever possible, " 'even in situations where to do so will be inconsistent with proration

provisions in other policies.' " (*Reliance Nat. Indemnity Co. v. General Star Indemnity Co., supra,* 72 Cal.App.4th at p. 1076.) Here, as there was neither assertion nor evidence that enforcement of RLI's insuring language would intrude on the rights of the insured, it should be honored. "Equity should not be employed to override the terms of the insurance policies in this case. . . . Because the policy terms, as they apply in this case, do not conflict or offend public policy and do not infringe on any rights of the insured, there is no reason to disregard the express terms of both policies." (*Hartford Casualty Ins. Co. v. Travelers Indemnity Co.* (2003) 110 Cal.App.4th 710, 727 [2 Cal.Rptr.3d 18]; see also *Community Redevelopment Agency v. Aetna Casualty & Surety Co.* (1996) 50 Cal.App.4th 329, 338–340 & fn. 6 [57 Cal.Rptr.2d 755] [whether horizontal exhaustion rule applies depends on policy language].)

Fireman's Fund maintains that *AMHS Ins. Co. v. Mutual Ins. Co. of Arizona* (9th Cir. 2001) 258 F.3d 1090 (*AMHS*) addresses the parties' dispute "head-on" and supports its assertion that RLI's "duplicative insuring language" is given no greater effect merely because it appears in the insuring agreement. In *AMHS,* an excess insurer, Risk Retention Group (RRG), provided four layers of excess coverage over a primary insurer, Samaritan. The second layer was excess to several specifically named policies (including Samaritan and RRG's first layer), except that it also limited coverage to "ultimate net loss," defined as the excess of the limits of the underlying insurance and " 'any other valid and collectible insurance.' " (*Id.* at pp. 1094–1095.) The insured physician was also covered under a primary policy issued by Mutual Insurance Company of Arizona (MICA). Both the MICA policy and the second RRG layer contained "other insurance" clauses.

The Ninth Circuit Court of Appeals first acknowledged the distinction between excess and primary coverage, noting that they serve different purposes. The court also recognized that categorizing insurance policies is accomplished "with reference to the 'overall insuring scheme,' " and that this task "can be muddied by the inclusion of an 'other insurance' clause in an otherwise primary policy." (*AMHS, supra,* 258 F.3d at p. 1093.) The court went on to hold, however, that RRG's first and second excess layers were "equal-level insurers" with the MICA primary policy and must therefore contribute to the negligence judgment against the physician. (*Id.* at p. 1100.) In the court's view, these two RRG policies were not "true excess" and therefore attached upon exhaustion of the underlying Samaritan policy limits.[4]

---

[4] The third layer was not required to contribute because it applied to losses in excess of a specified amount, which had not been reached. (*AMHS, supra,* 258 F.3d at pp. 1099–1100.)

*AMHS* is not applicable here. First, the holding appears to depend on the characterization of RRG as a "specific excess" rather than a "true excess" insurer. The court explained the term "true excess" under Arizona law as insurance that has established a rate " 'after giving due consideration to known existing and underlying . . . primary policies.' [Citation.]" (*AMHS, supra,* 258 F.3d at p. 1093.) RRG, the court observed, had determined its rates based in part on known existing coverage, which did not include that of MICA. (*Id.* at p. 1096.) Having no awareness of the MICA primary policy, RRG did not set its rates based on the existence of the MICA coverage. Accordingly, the first two RRG excess layers were said to "attach immediately upon the exhaustion of the underlying Samaritan policy." (*Id.* at p. 1097.)

In this case, however, the RLI policy was expressly made excess to *all* underlying insurance, whether scheduled (specifically named) or unscheduled. We do not find it significant, as did the *AMHS* court, that RLI was unaware of all the coverage possessed by its insured when it set its rate. Carmel was only an *additional* insured in the underlying Acceptance policy. RLI was insuring a subcontractor that could have been expected to do business with any number of different contractors; consequently, the identity of the additional insureds changed with each new contract. Unlike RRG, RLI could not have "avoided the present dispute by ascertaining the total level of existing primary coverage prior to issuing its policy." (*AMHS, supra,* 258 F.3d at p. 1098.)

Secondly, the *AMHS* court's proration between excess and primary insurers does not appear to be consistent with California's approach to equitable contribution. If the case had arisen in this state, the court would have required exhaustion of the MICA policy limits before contribution from the second layer of RRG excess coverage, because "[t]he presence of an 'other insurance' provision in a primary policy does not transform that primary policy into an excess policy vis-à-vis a secondary carrier with excess coverage." (*North River Ins. Co. v. American Home Assurance Co.* (1989) 210 Cal.App.3d 108, 113 [257 Cal.Rptr. 129].) Although the majority in *AMHS* recited this rule, it nonetheless treated MICA, a primary insurer, as if it were on the same level as RRG, an excess carrier, based on MICA's "other insurance" clause. (*AMHS, supra,* 258 F.3d at p. 1100.) Moreover, the court emphasized that "[t]he risk assumed by the two insurers . . . was markedly different," a conclusion that should have foreclosed treatment of them as "equal-level insurers." (*Id.* at pp. 1097, 1100.)

Unlike the *AMHS* court, we adhere to the basic principle that an "other insurance" issue can arise only between carriers on the same level of coverage. Thus, for example, umbrella coverage is generally regarded " 'as true excess over and above any type of primary coverage, excess provisions

arising in any manner, or escape clauses.' " (*Continental Ins. Co. v. Lexington Ins. Co.* (1997) 55 Cal.App.4th 637, 647 [64 Cal.Rptr.2d 116], quoting Ostrager & Newman, Handbook on Insurance Coverage Disputes (8th ed.) § 11.(2003)[e].) The inapplicability of secondary coverage until exhaustion of primary limits generally " 'holds true even where there is more underlying primary insurance than contemplated by the terms of the secondary policy.' " (*Community Redevelopment Agency v. Aetna Casualty & Surety Co., supra,* 50 Cal.App.4th 329, 339, quoting *Olympic Ins. Co. v. Employers Surplus Lines Ins. Co.* (1981) 126 Cal.App.3d 593, 600 [178 Cal.Rptr. 908], italics omitted.)

█ But labels are not dispositive; it is the policy language that controls the attachment of coverage. (*20th Century Ins. Co. v. Liberty Mut. Ins. Co.* (9th Cir. 1992) 965 F.2d 747, 756.) Here, when all of the relevant provisions are read in context, with each clause lending meaning to the other, it is clear from the language of the RLI agreement that it offers a different level of coverage to its insured than the Fireman's Fund policy. Accordingly, it is unnecessary to resort to proration based on the competing "other insurance" clauses in the two policies.

*Home Ins. Co. v. St. Paul Fire & Marine Ins. Co.* (1st Cir. 2000) 229 F.3d 56, also cited by Fireman's Fund, is likewise inapposite. There the issue was whether an "other insurance" clause of the primary policy and a "prior acts" clause of another primary policy were mutually repugnant, thus requiring proration. (*Id.* at p. 59.) This case, as we have concluded, involves two insurers at different levels. The general rule requiring proration is inapplicable here.

A more comparable case than those on which Fireman's Fund relies is *Lumbermens Mut. Cas. Co. v. Allstate Ins. Co.* (1980) 51 N.Y.2d 651 [417 N.E.2d 66, 435 N.Y.S.2d 953] (*Lumbermens*). There four different liability policies were asked to contribute to coverage after an automobile accident: a primary Allstate policy issued to the corporate owner of the car; an Allstate policy issued to the driver's mother, providing that the coverage was excess if her son drove a nonowned vehicle; an "executive" excess policy issued by Allstate to the driver's father; and a "Catastrophe" policy issued by Lumbermens to a business group to which the corporate owner belonged. (*Id.* at p. 654.) The high court of New York held that the general rule requiring proration among multiple policies covering the same risk was inapplicable "because its use would effectively deny and clearly distort the plain meaning of the terms and the policies of insurance here involved." (*Id.* at p. 655.) The court then examined the terms of each policy to ascertain the meaning and intent of their respective provisions. Accordingly, the policy held by the driver's mother was "designed" to be excess to the car owner's primary

policy;[5] the father's "executive" policy, on the other hand, "was not just a simple excess policy, but was designed specifically to provide coverage in excess of that provided by [the mother's] policy."[6] (*Ibid.*) As to the Lumbermens "Catastrophe" policy issued to the corporate owner, the parties to this contract "did not bargain for a ratable contribution with any of the Allstate policies." (*Id.* at p. 656.) Its coverage had been made expressly excess to "all other coverage available, including excess coverage."[7] (*Lumbermens, supra,* at p. 656.)

 As in *Lumbermens*, application of proration to Fireman's Fund and RLI here would be to ignore or distort the meaning and intent of the coverage terms. As the New York court later explained, "The rule to be distilled from these cases is that an insurance policy [that] purports to be excess coverage but contemplates contribution with other excess policies or does not by the language used negate that possibility must contribute ratably with a similar policy, but must be exhausted before a policy [that] expressly negates contribution with other carriers, or otherwise manifests that it is intended to be excess over other excess policies." (*State Farm Fire and Casualty Co. v. LiMauro* (1985) 65 N.Y.2d 369, 375–376 [482 N.E.2d 13, 18, 492 N.Y.S.2d 534]; see also *Allstate Ins. Co. v. Employers Liability Assur. Corp.* (5th Cir. 1971) 445 F.2d 1278, 1283 [priority among insurers resolved by analyzing language of each policy to determine "intention of each contract within the design of a consistent overall insuring scheme"].)

The Fourth District, Division Two, reinforced the importance of looking first to contractual language in the recent case of *Travelers Cas. & Surety Co. v. Transcontinental Ins. Co.* (2004) 122 Cal.App.4th 949 [19 Cal.Rptr.3d 272]. There an insurer, Federal Insurance Company (Federal), provided two types of excess coverage to its insured contractor. Addressing Coverage A, the court held that the contract language plainly obligated Federal to defend the insured when the listed "underlying insurance" was exhausted. (*Id.* at p. 956.) Supporting this conclusion was the court's comparison of Coverage

---

[5] The mother's policy insured her son while driving a nonowned automobile, but provided that " 'If there is other insurance . . . the insurance with respect to a . . . nonowned automobile shall be excess insurance over any other collectible insurance.' " (*Lumbermens, supra,* 51 N.Y.2d at p. 654.)

[6] The father's "executive" policy provided that Allstate would pay the " 'net loss in excess of insured's retained limit.' The term 'retained limit' was then defined as 'the sum of applicable limits of underlying policies listed in Schedule A hereof and the applicable limits of any other underlying insurance collectible by the insured'." (*Lumbermens, supra,* 51 N.Y.2d at p. 654.) Schedule A listed the mother's policy. The father's policy also included an excess "other insurance" clause stating that coverage was excess to other collectible insurance available to the insured.

[7] Lumbermens provided coverage in excess of " 'any other valid and collectible insurance available to the insured, whether such other insurance is stated to be primary, contributing, excess or contingent.' " (*Lumbermens, supra,* 51 N.Y.2d at p. 655.)

A with Coverage B: Whereas Coverage A did not condition a defense upon exhaustion of other insurance, Coverage B required a defense only when a plaintiff sought damages "to which no underlying insurance or other insurance applies."[8] (*Id.*, at p. 956.)

Noteworthy in *Travelers* was Federal's argument that its "other insurance" clause was a condition precedent to the existence of coverage and thus to its duty to defend. The court rejected Federal's argument. Not only was the "other insurance" clause irrelevant to the defense obligation, but it was located in the "Conditions" section, which set forth the "rights, obligations, and interpretive aids 'applicable to' coverage under the policy rather than conditions that must be fulfilled *prior to the existence of coverage.*" (*Travelers Cas. & Surety Co. v. Transcontinental Ins. Co., supra*, 122 Cal.App.4th at p. 957.) The "other insurance" clause itself was "a condition to *payment of claims* when coverage exist[ed], but [did] not constitute a condition to coverage or Federal's duty to defend." (*Id.* at p. 956.) Federal's reliance on the "other insurance" clause was also misplaced because it was "contrary to the rule that insurance provisions that take away or limit coverage must be conspicuous, plain, and clear." (*Id.* at p. 958.)

Although the *Travelers* decision pertained to the broader duty to defend rather than the duty to indemnify, the appellate court's emphasis on an examination of policy language, particularly the basic insuring agreement, is likewise appropriate here. Like Coverage A in *Travelers*, section 1 of the Fireman's Fund policy obligated Fireman's Fund to provide coverage when a specific underlying policy, that of Reliance, was exhausted. RLI's policy, on the other hand, was more akin to Federal's Coverage B by expressly conditioning the insurer's obligation on the exhaustion of not only the Acceptance limits but also those of "any insurance policies available to any insured (whether primary, excess, excess-contingent, or otherwise)." (Compare *Community Redevelopment Agency v. Aetna Casualty & Surety Co., supra*, 50 Cal.App.4th at pp. 335, 338 & fn. 6 [policy language expressly conditioned defense obligation on absence of other insurance providing defense].)

 In summary, the overall intent and purpose of the two policies at issue here can be discerned from their respective insuring terms read in context and in light of the entire policy in which they appear. Fireman's Fund provided coverage specifically excess to the underlying primary policy, whereas RLI was liable for claims in excess of *any* other insurance. Because

---

[8] The indemnity provision in Coverage B (described in the policy as "Umbrella Liability Insurance") obligated Federal to pay " 'damages the **insured** becomes legally obligated to pay' . . . in excess of a certain limit or the amount payable by '**other insurance**, whichever is greater.' " (*Travelers Cas. & Surety Co. v. Transcontinental Ins. Co., supra*, 122 Cal.App.4th at p. 952.)

the two policies did not operate at the same level of coverage, it was irrelevant that they both contained excess-only "other insurance" clauses. As the Fireman's Fund policy limit was not exceeded by the Vargas settlement, RLI had no duty to contribute to the indemnification of Carmel.

## Disposition

The judgment against RLI is reversed. RLI is entitled to its costs on appeal.

Manoukian, J., and McAdams, J., concurred.

Respondent's petition for review by the Supreme Court was denied May 30, 2005. Kennard, J., was of the opinion that the petition should be granted.