Filed 12/6/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| ADVENT, INC., <br><br> Plaintiff, <br><br> v. <br><br> NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, <br><br> Defendant and Respondent; <br><br> TOPA INSURANCE COMPANY, <br><br> Intervener and Appellant. | H041934 <br> (Santa Clara County <br> Super. Ct. No. 1-13-CV238904) |

Advent, Inc. (Advent) was hired as the general contractor for the Aspen Family Village project in Milpitas, California. Advent subcontracted with Pacific Structures, Inc. (Pacific). In turn, Pacific subcontracted with Johnson Western Gunite (Johnson). Advent was covered by an insurance policy issued by Landmark American Insurance Company (Landmark) and an excess insurance policy issued by appellant Topa Insurance Company (Topa). Johnson was covered by primary and excess insurance policies issued by respondent National Union Fire Insurance Company of Pittsburgh, PA (National Union).

While construction on the project was underway, a Johnson employee, Jerry Kielty, fell down an unguarded stairway shaft at the project site and sustained serious injuries. Kielty sued Advent, and Advent tendered its defense to its various insurance companies and to National Union. National Union initially refused the tender but later accepted it under a reservation of its rights. Kielty settled his action for a sum of

$10 million. Various insurers, including Topa and National Union (under its primary policy), contributed to the settlement. National Union continued to reserve its rights during the settlement process, and it did not provide coverage under its excess policy.

Advent initiated this underlying action when it sued National Union, seeking a declaration that it was an "additional insured" under National Union's excess policy. Topa successfully intervened in the action, seeking declaratory relief, equitable contribution from National Union, and equitable subrogation. Advent moved for summary judgment, which was denied. Advent then dismissed its complaint against National Union with prejudice. Subsequently, Topa and National Union filed cross-motions for summary judgment. The trial court denied Topa's motion and granted National Union's motion. Judgment was entered in favor of National Union, and Topa appealed. As we explain below, we find that the trial court did not err when it granted National Union's motion for summary judgment. We affirm.

## BACKGROUND

### A. **The Contractor and Subcontractors**

Advent was hired by Global Premier Development, Inc. and Aspen Construction Management, Inc., to be the general contractor for the Aspen Family Village project in Milpitas, California. Advent subcontracted with Pacific. In turn, Pacific subcontracted with Johnson to furnish and install shotcrete for the perimeter walls of the project.

### B. **The Subcontracts**

#### i. *The Advent/Pacific Subcontract*

Advent subcontracted with Pacific on January 14, 2008 (Advent/Pacific subcontract). The subcontract set forth certain definitions. "Contractor" referred to Advent. "Subcontractor" referred to Pacific. "Sub-subcontractor" was defined as any subcontractor, architect, engineer, surveyor, laborer, or material man hired or employed by the subcontractor (Pacific). The term "Subcontract" or "Contract" referred to "this

2

Subcontract [meaning the Advent/Pacific subcontract], including all Plans, Specifications, General Conditions, Supplemental General Conditions, Special Conditions, Amendments and all other documents issued by the Contractor and/or prepared by the Architect for the Project." Pacific was to be paid $6,275,000 for its work under the subcontract.

The Advent/Pacific subcontract contained a provision regarding insurance. The provision stated, "Minimum insurance requirements are: General Liability of $1,000,000 . . . Workers Compensation. General Liability . . . must have endorsements showing the Owner, Contractor [Advent] and Lender as Additional Insured, primary as to any and all claims, and any insurance maintained by Contractor shall be excess and noncontributory."

      ii.     *The Pacific/Johnson Subcontract*

Pacific entered into a subcontract with Johnson on February 7, 2008 (Pacific/Johnson subcontract). The Pacific/Johnson subcontract referred to Johnson as the "subcontractor." It also provided that Johnson would be working on structural shotcrete for the Aspen Family Village project and would be paid $289,000. Further, it referenced the Advent/Pacific subcontract as the "original Contract" or just the "Contract."

Exhibit D of the Pacific/Johnson referenced insurance. In a paragraph, it stated: "A. Insurance Requirements: All subcontractors must provide Insurance Certificates as designated in the Subcontract, naming parties listed on the attached sheet as additional insured. Original signatures are required on all insurance certificates. Insurance certificates must be submitted to Advent prior to commencement of work under this Subcontract." The attached sheet required Johnson to submit certificates of liability insurance to Advent and required that Advent be listed as an additional insured.

3

Despite the language of exhibit D and its attached sheet, the subcontract between Pacific and Johnson did not actually designate anything about insurance.

## C. The Various Insurance Policies

### i. *The Landmark Policy*

Advent was insured by Landmark under a $1 million general commercial liability policy, which was in effect at the time of the accident.

### ii. *The Topa Policy*

Advent was also insured by Topa under a $5 million excess commercial general liability policy, which was in effect at the time of the accident.

The Topa excess policy provides that its excess liability indemnity extends to "indemnify the insured for the amount of loss which is in excess of the applicable limits of liability, whether collectible or not, of the Underlying Insurance inserted in Item 6 of the Declarations . . . ." Item 6 of the declarations lists, as the general liability policy, the Landmark policy. "Loss" is defined as "the sum paid in settlement of losses for which the insured is liable after making deduction for all recoveries, salvages or other insurance (other than recoveries under the policy of the Underlying Insurance) whether recoverable or not, and shall include all expenses and 'costs.' "

### iii. *The National Union Policies*

Johnson was insured by National Union under a $1 million primary general liability policy, which was in effect at the time of the accident. The policy was amended to include, as additional insureds, those "where required by written contract."

Johnson was also insured by National Union under a $15 million excess liability policy that was in effect at the time of the accident. The excess liability policy stated that "insured" meant "any person or organization, other than [Johnson], included as an additional insured under [the National Union primary policy], but not for broader coverage than would be afforded by [the primary policy]."

4

The National Union excess policy expressly states that National Union "will not make any payment under [the excess] policy unless and until: [¶] 1. the total applicable limits of Scheduled Underlying Insurance have been exhausted by the payment of Loss to which this policy applies and any applicable, Other Insurance have been exhausted by the payment of Loss . . . ."  "Other Insurance" is defined as "a valid and collectible policy of insurance providing coverage for damages covered in whole or in part by this policy."

D. **The Accident**

The undisputed facts of the accident giving rise to this insurance coverage action are as follows:  At around 11:40 a.m. on August 22, 2008, Jerry Kielty, who was employed by Johnson, was working as a cement pump operator.  At around noon, the Johnson foreman directed Kielty to retrieve a piece of plywood that had been left outside between buildings 60 and 70.  The path to retrieve the plywood was completely outside.  Later, a driver of a cement truck reported that he had seen Kielty enter building 70.  The driver did not see Kielty leave the building.  Between noon and 1:00 p.m., the Johnson supervisor sent the foreman to find Kielty.  The foreman searched the areas between buildings 60 and 70.  He did not find Kielty.  At approximately 1:15 p.m., two Helix Electric employees said that they heard something fall in the garage area.  At around 1:35 p.m., while searching for a ladder inside building 70, a Pacific employee found that Kielty had fallen in the stairwell area of the building.  At the time, Johnson was not performing any work in the interior of the building.  Kielty suffered severe injuries as the result of the fall and could not remember how he fell.

E. **The Kielty Action**

On March 27, 2009, Kielty filed an action in Santa Clara County Superior Court (*Kielty et al. v. Advent, Inc. et al.*, Sup. Ct. No. 1-08-CV122946) (Kielty Action) seeking damages for the injuries he had sustained in the accident.  Kielty named, among others, Advent as a defendant.  Kielty alleged that he fell down the unguarded stairwell as a

5

result of the negligence of the named defendants, including Advent. Kielty did not name Johnson as a defendant.[1]

Advent tendered its defense to its insurers and included National Union. Advent contended that it was an additional insured under the policies issued by National Union to Johnson. National Union initially refused the tender but later agreed to share the cost of defending Advent under a reservation of its rights.

Advent's answer alleged that Kielty was negligent and that other parties or third parties not a part of the action were responsible for the damages incurred by Kielty.

F. **Advent's Cross-complaint**

Advent and Global cross-complained against Johnson for express indemnity under the contract between Pacific and Johnson, breach of contract, equitable indemnity, contribution, declaratory relief, and negligence. In part, Advent alleged that Kielty's injuries were sustained as a result of Johnson's negligence, carelessness, tortious acts, or other acts or omissions by Johnson and its employees, which included Kielty.

Advent and Johnson moved for summary judgment on the cross-complaint. The trial court denied Advent's motion for summary judgment, finding that Johnson did not have a duty to indemnify Advent. The Advent subcontract had an indemnity provision. However, the trial court concluded that the Pacific/Johnson subcontract had no indemnification language and could not be reasonably interpreted as incorporating the indemnity provisions in the Advent/Pacific subcontract. Additionally, the trial court noted that Kielty did not allege that Johnson was liable for his injuries. Kielty's complaint did not allege that Johnson was responsible for the stairwell shaft where he fell or that anyone employed by Johnson had directed him to enter the building.

---

[1] At some point, Kielty made a successful worker's compensation claim with Johnson.

6

Furthermore, with respect to Advent's cause of action for breach of contract, the court found that Johnson had met its initial burden by supplying an insurance certificate showing that Johnson had complied with the requirement to provide insurance to Advent.

The trial court granted Johnson's motion for summary judgment, and Advent dismissed Johnson from the Kielty Action with prejudice.

G. **Kielty's Settlement**

Kielty entered into a partial settlement in the Kielty Action for $10 million. Under the settlement, Landmark paid $1 million, Topa paid $5 million, National Union paid $1 million, and the remainder was paid by other insurers. During the settlement process, National Union continued to reserve its rights under both its primary and excess policies. The settlement agreement stated that its payment was made "on behalf of its insured [Johnson] and alleged insureds Advent, Global and [Pacific]."

As part of the settlement, Kielty agreed to stay the action pending a determination of whether Advent was an additional insured under National Union's policies. If it was determined that Advent was not an additional insured under National Union policies, Kielty agreed to dismiss all claims against Advent with prejudice. If, however, it was determined that Advent was an additional insured under National Union's policies, the stay would be lifted and trial would proceed against Advent only.

H. **The Present Action**

After the partial settlement, Advent initiated this present action by suing National Union for declaratory relief. Advent sought a declaration that it was an additional insured under National Union's $15 million excess policy.

Advent moved for summary judgment, which was denied. The trial court cited to some procedural defects with Advent's motion, but also noted that it was "not persuaded that Advent's interpretation of the relevant documents establishes that it is entitled to the declaration it is seeking." Afterwards, Advent dismissed its complaint against National

7

Union with prejudice. Kielty thereafter dismissed his action against Advent, making the partial settlement the full and final settlement of the Kielty Action.

Before the denial of Advent's motion for summary judgment and the dismissal of Advent's complaint, Topa intervened in the action, seeking equitable contribution for its $5 million contribution to the settlement. Topa asserted claims against National Union for equitable contribution, equitable subrogation, and declaratory relief.

Thereafter, Topa and National Union filed cross-motions for summary judgment.

Topa alleged that Advent is an additional insured under both of Johnson's National Union policies under the insurance requirements in the subcontract between Pacific and Johnson. In support of this proposition, Topa pointed to the language of the National Union policies, the Advent/Pacific subcontract, and the Pacific/Johnson subcontract. Topa argued that based on the wording of the Pacific/Johnson subcontract, Johnson was required to add Advent as an additional insured under its primary policy with National Union. As a result, National Union's excess policy provided coverage to Advent. Topa also alleged that there was coverage under National Union's policies, because the undisputed facts demonstrated a potential that Johnson (or Kielty himself) contributed to Kielty's injuries.

In its opposition to Topa's motion for summary judgment, National Union argued that Johnson never agreed to provide Advent with additional insurance coverage based on the language of the Pacific/Johnson subcontract, National Union's excess policy was in excess of Topa's policy and therefore did not apply, and, regardless, Topa failed to demonstrate that there was actual coverage rather than potential coverage, as the issue here was one of indemnity and not defense.

National Union, in its motion for summary judgment, echoed many of the same arguments that were contained in its opposition to Topa's motion for summary judgment. National Union claimed that it was entitled to judgment in its favor because the

8

subcontract between Johnson and Pacific did not require Johnson to purchase additional insured coverage for Advent. Further, National Union argued that even if Johnson was required to purchase additional insured coverage for Advent, coverage would apply only if Johnson's acts or omissions caused Kielty's injuries, which also had to be incurred during the performance of Johnson's ongoing operations for Advent. National Union maintained that these conditions were not present.

Finally, National Union asserted that the excess additional insured coverage could not be broader than the coverage available under the primary policy, and the primary policy here applied only "where required by written contract." National Union insisted that the primary policy had a limit of $1 million. Therefore, total additional insured coverage (if any existed) could not exceed $1 million. And Advent had its own excess insurance through Topa, which properly paid Kielty's claim.

After considering the parties' arguments, the trial court granted National Union's motion and denied Topa's motion. As to Topa's first cause of action seeking a declaration that Advent was an additional insured under National Union's excess policy, the trial court concluded that the language of the policies did not support Topa's interpretation that Advent was an additional insured. Namely, the subcontract between Pacific and Johnson could not be reasonably interpreted as incorporating by reference the insurance requirements in the Advent/Pacific subcontract. Further, the Pacific/Johnson subcontract did not include an express insurance requirement of any kind. The only reference in the Pacific/Johnson subcontract to insurance was the generic reference in exhibit D that required subcontractors to provide insurance certificates as designated in the subcontract. The trial court concluded that "[p]oor drafting of contract language by Advent and/or [Pacific] cannot be construed against [Johnson]." Therefore, the trial court determined that Topa failed to show that there was a written contract that required

9

Johnson to name Advent as an additional insured on any specific policy type.  The trial court also concluded that Kielty never alleged that Johnson was at fault for his accident.

As to Topa's claims of equitable contribution and equitable subrogation, the trial court determined that the same evidence supporting its conclusion that Topa's sought-after declaration that Advent was an additional insured under the National Union excess policy also supported the conclusion that the equitable claims failed.

Judgment was entered in favor of National Union.  Topa appealed.

## DISCUSSION

Topa argues that the trial court erred when it granted summary judgment in favor of National Union.  We conclude the court did not err.

1. *Overview of Summary Judgment Motions and Standard of Review*

"[W]here the plaintiff has . . . moved for summary judgment . . . [it] has the burden of showing there is no defense to a cause of action.  (Code Civ. Proc., § 437c, subd. (a).)  That burden can be met if the plaintiff 'has proved each element of the cause of action entitling [it] to judgment on that cause of action.'  (Code Civ. Proc., § 437c, subd. (p)(1).)  If the plaintiff meets this burden, it is up to the defendant 'to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto.'  (Code Civ. Proc., § 437c, subd. (p)(1).)"  (*S.B.C.C.*, *Inc*. *v*. *St. Paul Fire & Marine Ins*. *Co*. (2010) 186 Cal.App.4th 383, 388.)

"A defendant or cross-defendant has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action."  (Code Civ. Proc., § 437c, subd. (p)(2).)  Once the defendant or cross-defendant has met this initial burden, the burden shifts to the plaintiff to produce admissible evidence showing that a triable issue exists.  (*Ibid*.)

10

"The fact that both parties moved for summary judgment does not conclusively establish the absence of a triable issue of fact; the trial court must independently determine the motions." (*Tahoe Regional Planning Agency v. King* (1991) 233 Cal.App.3d 1365, 1375, fn. 2.) We may affirm on any legally correct ground, "regardless of the grounds relied upon by the trial court." (*Becerra v. County of Santa Cruz* (1998) 68 Cal.App.4th 1450, 1457.)

2. *Overview of Topa's Claims*

Topa's complaint-in-intervention alleged three causes of action: (1) a cause of action for declaratory relief seeking a declaration that Advent was an additional insured under National Union's excess policy, Advent was entitled to coverage under the excess policy, and Topa is entitled to reimbursement for a portion of the settlement that Topa paid; (2) a cause of action for equitable contribution, and (3) a cause of action for equitable subrogation.[2]

"Equitable contribution apportions costs among insurers sharing the same level of liability on the same risk as to the same insured, and is available when several insurers are ' "obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without participation by the others." . . . "The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others." ' " (*Safeco Ins. Co. of America v. Superior Court* (2006) 140 Cal.App.4th 874, 879 (*Safeco*).)

---

[2] Topa made no argument in the trial court and no argument on appeal regarding its cause of action for equitable subrogation. We therefore deem this issue waived. (*Rutledge v. Hewlet-Packard Co.* (2015) 238 Cal.App.4th 1164, 1171, fn. 3.)

11

3. *Coverage for Injuries "Caused By" Johnson or Those Acting on Johnson's Behalf*

First, Topa argues that the trial court erred in rejecting its argument that exhibit D in the Pacific/Johnson subcontract's statement that Johnson was to provide insurance certificates as designated in the "Subcontract" referred to the Advent/Pacific subcontract. National Union, however, maintains that even if we were to find that the trial court erred in concluding that the Pacific/Johnson subcontract is not reasonably susceptible to Topa's interpretation, summary judgment was still properly granted in its favor because Topa failed to show that Kielty's injuries were caused by Johnson. Absent causation by Johnson, National Union's excess policy would not afford Advent with coverage. As we explain below, we agree with National Union's argument on this point and find that this issue is dispositive.

a. **Burdens of Proof in Equitable Contribution Claims**

Before we address the merits of National Union and Topa's appellate arguments regarding coverage, we first review the applicable burdens of proof that must be met by parties moving for summary judgment in an equitable contribution action. On appeal, the parties dispute a critical issue: whether Topa bore the burden to prove that Kielty's accident was *actually covered* by National Union's policies, or whether National Union bore the burden to prove that Kielty's accident was *not actually covered*.

"An insurer's duty to indemnify 'runs to claims that are actually covered, in lights of the facts proved. . . . By definition, it entails the payment of money in order to resolve liability. . . . It arises only after liability is established.' " (*Safeco*, *supra*, 140 Cal.App.4th at p. 880.) "By settling, however, the parties forgo their right to have liability 'established' by a trier of fact, and the settlement 'becomes presumptive evidence of the [insured's] liability and the amount thereof, which presumption is subject to being overcome by proof. . . . "A contrary rule would make the right to settle meaningless." ' " (*Ibid*.)

12

Topa argues that under *Safeco*, *supra*, 140 Cal.App.4th 874, it only needed to demonstrate a potential for coverage under National Union's excess policy. Thereafter, the burden shifted to National Union to show, as an affirmative defense, that coverage did not exist.

In *Safeco*, the plaintiff (the settling coinsurer) sued the nonparticipating coinsurer for equitable contribution and declaratory relief, alleging that the nonparticipating coinsurer had breached its duty to defend and was thus obligated to reimburse the settling coinsurer for its share of the defense and settlements. (*Safeco*, *supra*, 140 Cal.App.4th at p. 877.) The settling coinsurer moved for summary judgment, or summary adjudication, on its claims. The nonparticipating coinsurer responded by arguing that the settling coinsurer had to prove both that the nonparticipating coinsurer had a duty to defend based on a potential for coverage and that there was, in fact, actual coverage under the nonparticipating coinsurer's policies. (*Id*. at p. 878.) The trial court denied the settling coinsurer's motion for summary judgment, siding with the nonparticipating coinsurer that the settling coinsurer had to prove that it was entitled to contribution as a matter of law. (*Ibid*.) The settling coinsurer filed a petition for writ of mandate challenging the trial court's ruling.

The appellate court agreed with the settling coinsurer and rejected the nonparticipating coinsurer's argument that the settling insurer bore the burden of proving that the coinsurer had a duty to indemnify their mutual insureds. (*Safeco*, *supra*, 140 Cal.App.4th at p. 880.) The *Safeco* court reasoned that a nonparticipating coinsurer waives its right to challenge the reasonableness of a settlement amount with the insured. (*Id*. at p. 881.) The nonparticipating coinsurer, however, does not waive its right "to raise other coverage defenses as affirmative defenses in a contribution action—which means, of course, that the recalcitrant coinsurer has the burden of proof on those issues." (*Ibid*.) Therefore, the *Safeco* court held that "in the circumstances of [their] case—where [the

nonparticipating coinsurer's] duty to defend is undisputed, and where by law the settlements are presumptively reasonable—the burden of proof is on [the nonparticipating coinsurer] to establish that there was no coverage (and not on the [settling coinsurer] to prove the opposite)." (*Ibid*.) Therefore, the appellate court granted the settling coinsurer's petition for a writ of mandate to the extent that it sought a determination that the settling coinsurer had met its burden by showing a potential for coverage, and the burden then shifted to the nonparticipating coinsurer to prove the absence of actual coverage.

National Union rejects the application of the burden-shifting principles enunciated in *Safeco*, arguing that *Safeco* is factually distinguishable because it involved primary insurers not excess insurers, and because the public policy that supported the shifting of burdens in *Safeco* is not present in this current situation. Unlike the nonparticipating coinsurer in *Safeco*, National Union provided a defense under its primary policy and paid $1 million under its primary policy toward the settlement of the Kielty Action. National Union maintains that because Topa seeks contribution from National Union's *excess* policy, adhering to the principle that Topa must prove existence of actual coverage would not "encourage insurance companies to disavow their contractual responsibilities to their insureds [citation] and, by extension, their responsibilities to coinsurers." (*Safeco*, *supra*, 140 Cal.App.4th at p. 881.)

We agree with National Union that *Safeco* is factually distinguishable. As National Union points out, National Union tendered a defense under its primary policy. It is therefore *not* like the nonparticipating coinsurer in *Safeco* who refused to tender its insured a defense and thereafter refused to contribute to the settlement. Rather, the dispute here concerns whether National Union's *excess* policy provides coverage to Advent for Kielty's injuries. Additionally, unlike *Safeco*, National Union's duty to defend was disputed below. Although National Union accepted tender of Advent's

14

defense, it did so under a reservation of rights and never conceded that it was obligated to defend Advent in the Kielty action.

Despite these factual distinctions, we find the rationale behind the burden-shifting in *Safeco* to be applicable here. First, we note that the discussion of "burdens" is complicated by the fact that both Topa and National Union filed motions for summary judgment, or in the alternative, summary adjudication, below. These cross-motions for summary judgment are crucial to understand each party's burden of proof. That is because the burdens allocated to parties are, in part, dictated by whether a party is *bringing* the motion for summary judgment or *opposing* the motion for summary judgment.

Take *Safeco* as an example. In *Safeco*, the moving party was the settling coinsurer. Under the general principles governing summary judgment motions, the settling coinsurer (as the moving party) bore the burden to make a prima facie showing in its motion that there was no triable issue of material fact, it was entitled to judgment as a matter of law, and there was no defense to the cause of action. (Code Civ. Proc., § 437c, subds. (c) & (p)(1).) As articulated above, *Safeco* held that the settling coinsurer met its initial burden on its summary judgment motion by making a prima facie showing that there was coverage under the nonparticipating coinsurer's policy (which was satisfied by showing that there was a *potential* for coverage). In other words, the settling coinsurer did not have to go out of its way to negate an affirmative defense such as lack of coverage.

Like the settling insurer in *Safeco*, Topa bore the burden on its motion for summary judgment to make a prima facie showing that there was no triable issue of material fact—that actual coverage existed under National Union's excess policy. "A prima facie showing is one that is sufficient to support the position of the party in question." (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 851.) Certainly, in

15

cases where the plaintiff has *not* settled the case, liability would often be conclusively established by the ensuing trial's outcome. A trier of fact would determine which insured (or insureds), if any, are liable for the plaintiff's injuries. Here, however, Kielty settled the action before it went to trial. "By settling . . . the parties forgo their right to have liability 'established' by a trier of fact, and the settlement 'becomes presumptive evidence of the [insured's] liability and the amount thereof, which presumption is subject to being overcome by proof.' " (*Safeco*, *supra*, 140 Cal.App.4th at p. 880.) In this case, National Union continued to reserve its rights throughout the settlement process, so the settlement cannot be used as presumptive evidence that National Union's policy applies.

What we are left with are the allegations in Kielty's complaint and the parties' undisputed facts recounting the accident. From this, we believe that Topa can satisfy its initial burden to make a prima facie showing of actual coverage if it can demonstrate a *potential* for coverage based on known extrinsic facts and the allegations of the complaint. As noted by *Safeco*, this is the same as the potential liability triggering a duty to defend. (*Safeco*, *supra*, 140 Cal.App.4th at p. 879.)

Similarly, National Union, on *its* motion for summary judgment, bears the initial burden to show that a cause of action cannot be established or that there is a complete defense to Topa's causes of actions. (Code Civ. Proc., § 437c, subd. (p)(2).) National Union could achieve this by presenting affirmative evidence negating an essential element of Topa's claim. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.) Alternatively, National Union could also meet its initial burden by proving each element of an affirmative defense to Topa's claim of coverage, such as the affirmative defense that there was no actual coverage. (*Safeco*, *supra*, 140 Cal.App.4th at p. 878 [characterizing absence of actual coverage as an affirmative defense to equitable contribution].) If National Union meets this burden, the burden would shift to Topa to

16

produce admissible evidence showing that a *triable issue of fact* exists. (Code Civ. Proc., § 437c, subd. (p)(1).)

Applying these principles, we come to the following conclusion: Topa is correct that in order to satisfy its initial burden on its motion for summary judgment, it had to make a prima facie showing of actual coverage. (In other words, Topa must show that there is a potential for coverage.) The burden would then shift to National Union to demonstrate that there is a triable issue of material fact—that there is evidence or a reasonable inference showing that there is no actual coverage. On the other hand, when National Union moves for summary judgment, it must satisfy its initial burden by showing there are undisputed facts supporting each element of its affirmative defense of lack of coverage. Once National Union has satisfied this initial burden, Topa must prove that a triable issue of material fact exists—again, that there is evidence or a reasonable inference that there *is* coverage.

b. **Application to this Case**

With these concepts in mind, we first evaluate whether National Union met its initial burden on its motion for summary judgment to demonstrate that coverage cannot be established. We find that based on the undisputed facts in the record, National Union met its initial burden.

According to the National Union primary policy, coverage for additional insured extends only "with respect to liability for 'bodily injury,' 'property damage' or 'personal and advertising injury' caused, in whole or in part, by: [¶] 1. Your [Johnson's] acts or omissions; or [¶] 2. The acts or omissions of those acting on your [Johnson's] behalf; [¶] in the performance of your [Johnson's] ongoing operations for the additional insured(s) at the location(s) designated above."

The National Union excess policy provides that National Union "will pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes

17

legally obligated to pay as damages by reason of liability imposed by law because of Bodily Injury . . . *to which this insurance applies . . . .*" (Italics added.) Accordingly, the excess policy applies only to those claims covered by the primary policy. The issue is thus whether Kielty's injuries were caused, in whole or in part, by Johnson or by someone acting on behalf of Johnson.

The following facts are undisputed: Kielty was working as a cement pump operator for Johnson when the accident occurred. Around noon, Kielty was directed by a Johnson foreman to retrieve a piece of plywood located outside between two buildings, building 60 and building 70. The path to retrieve the plywood was outside. Kielty did not return after being sent on this errand, and other workers searched for him twice in the area between buildings 60 and 70. Later, another subcontractor's employee found Kielty in a stairwell area inside of building 70. Johnson was not performing work in the interior of building 70 at the time of the accident.

In the underlying Kielty action, Kielty alleged that certain named defendants, including Advent, were negligent and caused his injuries. Johnson was not named in Kielty's lawsuit.

Based on these undisputed facts, National Union maintains that it is clear that Kielty's injuries were not "caused by" Johnson or someone acting on behalf of Johnson, which Topa argues could include the Johnson foreman or Kielty himself. Although a Johnson foreman directed Kielty to retrieve the plywood, the path was entirely outside. Furthermore, Johnson was not conducting work in the interior of building 70 at the time of Kielty's fall. There is no evidence shedding light on the circumstances of Kielty's fall and whether he was at fault himself. Based on the foregoing, we agree with National Union's assessment that it met its initial burden by demonstrating that Johnson's (or Kielty's) acts did not cause Kielty's injuries.

18

Topa, however, claims that it met *its* burden in opposing National Union's summary judgment motion by demonstrating that a triable issue of fact exists regarding the existence of coverage. Topa argues that based on the undisputed facts, Kielty's injuries were *potentially* caused by Johnson (or Kielty), because "[a]t all relevant times [Kielty] was acting on [Johnson's] behalf" and Kielty's injuries may have resulted from his own acts or omissions while he was acting on behalf of Johnson.

National Union argues that Topa's evidence is merely speculation, and not admissible evidence. " 'Speculation . . . is not evidence' that can be utilized in opposing a motion for summary judgment." (*Knapp v. Doherty* (2004) 123 Cal.App.4th 76, 99.) Speculation also differs from a reasonable inference. "When opposition to a motion for summary judgment is based on inferences, those inferences must be reasonably deducible from the evidence, and not such as are derived from speculation, conjecture, imagination, or guesswork." (*Joseph E. Di Loreto, Inc. v. O'Neill* (1991) 1 Cal.App.4th 149, 161.)

We agree with National Union that Topa does not actually provide evidence that shows that Kielty's injuries were caused by Johnson's acts or omissions or Kielty's own acts or omissions. The undisputed facts reflect that Kielty was directed by the Johnson foreman to retrieve plywood. However, for some reason, Kielty went *inside* the building, when the path to the plywood was outside, and fell down a stairwell. There is no evidence that Johnson caused Kielty to enter building 70. The foreman did not tell him to enter the building. Johnson was not even doing work inside building 70. In the Kielty Action, Kielty never alleged that Johnson was at fault for his fall.[3] And Kielty himself could not remember how he fell.

Topa seems to claim that based on the undisputed circumstances of Kielty's fall— the fact that he was at the jobsite and was directed by the Johnson foreman to retrieve

_____

[3] Topa posits in its opening brief that Kielty did not allege that Johnson was at fault, because Kielty had filed a worker's compensation claim with Johnson.

19

plywood when he fell—it can be reasonably inferred that Johnson was at fault. We disagree with Topa's assessment, which relies purely on speculation, not reasonable inferences.

Speculation about facts has been found to be insufficient when construing an insurer's duty to defend—which is broader than the duty to indemnify. When construing whether an insurer has a duty to defend courts have routinely held that the duty is determined by looking at the " 'facts alleged or otherwise disclosed.' . . . [¶] . . . it does not include *made up* facts, just because those facts might naturally be supposed to exist along with the known facts." (*Friedman Prof. Management Co., Inc. v. Norcal Mutual Ins. Co.* (2004) 120 Cal.App.4th 17, 34-35.) "An insured may not trigger the duty to defend by speculating about extraneous 'facts' regarding potential liability or ways in which the third party claimant might amend its complaint at some future date." (*Gunderson v. Fire Ins. Exchange* (1995) 37 Cal.App.4th 1106, 1114.) Along these same lines, we do not believe that an insurer establishes there is a *duty to indemnify* by speculating about extraneous facts. Nor is such speculation sufficient to create a triable issue of material fact.

National Union directs us to *St. Paul Fire & Marine Ins. Co. v. American Dynasty Surplus Lines Ins. Co.* (2002) 101 Cal.App.4th 1038 (*St. Paul*). In *St. Paul*, a licensed contractor (ARB) entered into a contract to perform construction work at a rail maintenance yard. Subsequently, ARB entered into a subcontract with Sasco to perform electrical work. Sasco was required to add ARB as an additional insured under Sasco's liability policy with American Dynasty. (*Id.* at p. 1043.) The subcontract with Sasco provided that Sasco agreed to indemnify ARB and the owner of the project for damages arising out of or resulting from the performance of its work, or from injury or destruction of property that arises or is alleged to have arisen in whole or in part by an act or omission of Sasco or any subcontractor under Sasco, or any servants, agents, or

20

employees. (*Id*. at p. 1044.) ARB had its own general liability policy issued by St. Paul. (*Ibid*.)

One day, an employee of Sasco was injured at the worksite after ARB was pressure-testing a pipe connected to a fuel tank that exploded, striking the employee. (*St. Paul*, *supra*, 101 Cal.App.4th at p. 1045.) Sasco was not involved in pressure-testing for the pipe, nor did its subcontract involve pressure-testing. At the time, ARB was working independently of Sasco. Prior to the explosion, the employee had heard a hissing noise, which frightened him and caused him to run from his worksite. While running, he was struck by a fragment from the pipe in his leg. The employee filed a lawsuit against ARB and the project owner. ARB and the project owner tendered its defense to St. Paul, and St. Paul tendered defense to American Dynasty, contending that the lawsuit was covered under the additional insured endorsement issued by American Dynasty. (*Ibid*.) American Dynasty denied coverage and refused tender of the defense. (*Ibid*.) Subsequently, St. Paul provided a defense to ARB and the project owner, and ultimately settled the lawsuit. St. Paul and ARB then brought a cause of action against Sasco and American Dynasty for breach of contract and declaratory relief, seeking to recover the amount that had been paid to settle the employee's lawsuit. (*Id*. at pp. 1045-1046.) The trial court agreed with St. Paul and ARB, but the appellate court did not. Following an appeal, the appellate court reversed the trial court's judgment in favor of St. Paul and ARB. (*Id*. at p. 1047.)

Interpreting the language of the subcontract agreement, the *St. Paul* court stated that by expressly limiting Sasco's obligation to indemnify from acts or omission arising out of or resulting from the work that Sasco was to perform, the parties intended "to limit the scope of Sasco's indemnity to injuries occurring in circumstances over which it has at least *some* control and where it is engaged in activity that is causally related in some manner to the injury for which indemnity is claimed." (*St. Paul*, *supra*, 101 Cal.App.4th

21

at pp. 1052-1053.) Further, "[t]o construe the promise of indemnity made by Sasco as applying merely because its employee was present within the zone of danger created *solely* by the negligence of ARB would offend . . . the clearly expressed intent of the parties in article 4.1 of the Subcontract . . . ." (*Id*. at p. 1054.)

Topa attempts to argue that it is sufficient that Kielty was at the project site that day when he was injured. However, like in *St*. *Paul*, there is no evidence that Kielty was engaged in activity over which Johnson had control over at the time of his accident. As we stated before, the undisputed facts reflect that Kielty was told to retrieve plywood outside, and the path to the plywood was completely outside. Somehow, Kielty fell down an unguarded shaft in building 70. At the time, Johnson was not performing work inside building 70. It was also not alleged that the unguarded shaft where Kielty sustained his injuries was hazardous due to some act or omission by Johnson or its employees. The only theory of causation advanced by Topa is the fact that Kielty was at the project site at the time of the accident. And as articulated in *St*. *Paul*, mere presence at a jobsite is insufficient to find that an accident or injury *arose* from a subcontractor's actions. Along those same lines, we do not believe that mere presence at a jobsite is sufficient to find that the accident was *caused by* Johnson's acts or omissions.

Topa cites to several cases from other jurisdictions that it claims supports its points. First, it cites to *First Mercury Ins*. *v*. *Shawmut Woodworking & Supply* (D. Conn. 2014) 48 F.Supp.3d 158 (*First Mercury*). In *First Mercury*, the plaintiff insurance company (First Mercury) sought a declaratory judgment that the defendants (a general contractor and a subcontractor) were not additional insureds under a general liability policy it had issued to Fast Trek, a sub-subcontractor. (*Id*. at p. 160.) In September 2010, a steel web structure collapsed, killing one Fast Trek worker and injuring three others. (*Ibid*.) The employees sued. Like this present case, First Mercury's policy extended coverage to the defendants but only for injuries "caused, in whole or in by part,

22

by" Fast Trek's acts or omissions or the acts or omissions of those acting on Fast Trek's behalf in the performance of Fast Trek's ongoing operations for defendants. (*Id*. at p. 167.)

First Mercury argued that it had no duty to defend the defendants, because there was no coverage since the employees' complaints did not name Fast Trek as a defendant. Therefore the lawsuit did not allege that the injuries were caused by Fast Trek. (*First Mercury*, *supra*, 48 F.Supp.3d at p. 168.) The federal district court disagreed, concluding that it could consider facts outside the four corners of the state court complaints that showed there was a "possibility that the injuries could have been caused at least in part by the acts or omissions of Fast Trek or those acting on its behalf." (*Ibid*.)

First, the district court held that facts extrinsic to the complaints—including an OSHA report—suggested the possibility of coverage, because there was evidence that the accident was at least partially attributable to Fast Trek. (*First Mercury*, *supra*, 48 F.Supp.3d at pp. 169-170.) The court also held that the allegations in the four corners of the complaints sufficiently created the possibility of coverage. (*Id*. at pp. 170-171.) Two of the complaints alleged that the employees were working for Fast Trek at the time of the accident and that the general contractor and subcontractor caused their injuries through their agents, servants, or employees—which would include Fast Trek. (*Id*. at p. 170.) Two of the other complaints similarly alleged that the general contractor and subcontractor acted negligently through their agents, servants, and/or employees—which again would include Fast Trek. (*Ibid*.) The complaints therefore suggested a possibility of coverage triggering First Mercury's duty to defend. (*Id*. at p. 171.)

Topa also cites to *Ramara*, *Inc*. *v*. *Westfield Ins*. *Co*. (E.D.Pa. 2014) 298 F.R.D. 219, which was cited by the *First Mercury* court. In *Ramara*, an employee of a construction subcontractor was injured at a jobsite. The employee thereafter asserted claims against the general contractor and not the employer—who he was barred from

23

suing under the state's worker compensation scheme. The *Ramara* court held that consideration of the four corners of the complaint gave rise to the possibility of coverage and the general contractor was entitled to a defense under the subcontractor's additional insured provision. The employee had alleged in its complaint that the general contractor was acting by and through its agents, servants, and/or employees. Accordingly, the court held that it was possible that the jury could find that the employer's conduct caused the employee's injury. (*Id*. at p. 226.)

Lastly, Topa relies on *Pro Con*, *Inc*. *v*. *Interstate Fire & Cas*. *Co*. (D.Me. 2011) 794 F.Supp.2d 242. In *Pro Con*, the allegations of the underlying complaint clearly established that the complained of injury arose from the insured's operations, even though the insured was not expressly named in the complaint. (*Id*. at p. 257.)

*First Mercury*, *Ramara*, and *Pro Con* are readily distinguishable from the present case. Kielty did not allege in his complaint that his accident was caused in whole or in part by those acting on behalf of Advent, which would have—conceivably—included Johnson as a subcontractor working under Advent's subcontractor, Pacific. Neither do the undisputed facts show that Kielty's injuries were sustained as a result of Johnson's acts at the project site that day. Again, Kielty's argument that Johnson was responsible, in whole or in part, for Kielty's accident is based solely on speculation.

Additionally, we must reject Topa's argument to the extent that it claims that Advent and the project owner's cross-complaint against Johnson in the main Kielty Action, which alleged that Johnson was negligent, creates a potential for coverage. The allegations made by Advent and the project owner in their cross-complaint against Johnson were not asserted against Johnson in the main Kielty Action—the action for which indemnity and coverage are sought. Therefore, the allegations in the cross-complaint cannot create coverage. (See *Monticello Ins*. *Co*. *v*. *Essex Ins*. *Co*. (2008) 162 Cal.App.4th 1376, 1389.)

24

For these reasons, we do not believe that Topa satisfies its burden in opposing National Union's motion for summary judgment. Topa's speculations about unknown facts fail to show that a triable issue of material fact exists regarding actual coverage. Accordingly, we do not believe the trial court erred when it granted National Union's motion for summary judgment. Without actual coverage, Topa cannot obtain equitable contribution from National Union. It is also not entitled to a declaration that it is entitled to reimbursement from National Union.

And for these same reasons, we do not find that Topa met its initial burden on its motion for summary judgment to make a prima facie showing of actual coverage. Topa's showing below consisted of its speculation regarding facts that do not actually exist in the record. We cannot reasonably infer from the stated evidence that Johnson, or Kielty himself, caused Kielty's injuries; we can only use guesswork or our imagination. Accordingly, we do not find the court erred when it denied Topa's motion for summary judgment.

### 4. *"Other Insurance" Clauses*

Additionally, even if we were to find that National Union's excess policy provided coverage to Advent as an additional insured, National Union would still be entitled to judgment in its favor. We agree with National Union that the Topa policy was a specific excess policy that attached prior to National Union's general excess policy.

### a. Policy Language

The National Union excess policy expressly states that National Union "will not make any payment under [the excess] policy unless and until: [¶] 1. the total applicable limits of Scheduled Underlying Insurance have been exhausted by the payment of Loss to which this policy applies and any applicable, Other Insurance have been exhausted by the payment of Loss . . . ." "Other Insurance" is defined as "a valid and collectible policy of insurance providing coverage for damages covered in whole or in part by this policy."

25

The Topa excess policy provides that its excess liability indemnity extends to "indemnify the insured for the amount of loss which is in excess of the applicable limits of liability, whether collectible or not, of the Underlying Insurance inserted in Item 6 of the Declarations . . . ." Item 6 of the declarations lists, as the general liability policy, the Landmark policy (Advent's primary policy). "Loss" is defined as "the sum paid in settlement of losses for which the insured is liable after making deduction for all recoveries, salvages or other insurance (other than recoveries under the policy of the Underlying Insurance) whether recoverable or not, and shall include all expenses and 'costs.' "

b. **Specific and General Excess Policies**

"When two insurers cover the same level of liability (e.g., both primary or both excess) on the same risk as to the same insured, courts may require each to contribute to the cost of defending the claim or indemnifying the loss." (*Carmel Development Co. v. RLI Ins. Co.* (2005) 126 Cal.App.4th 502, 507-508 (*Carmel Development*).) Many insurance policies contain an " 'other insurance' clause" that attempt to limit the insurer's liability to the extent that other insurance policies may cover the same risk. (*Id.* at p. 508.) "Although courts honor coverage terms, including 'other insurance' clauses, whenever possible, 'where the policies of two or more insurers of a common insured, providing [the same level of] coverage for the same risk, contain conflicting "other insurance" clauses . . . if one insurer pays more than its share of the loss or defense costs without participation from the other insurer or insurers, a right to contribution arises.' " (*Ibid.*)

Even when an insurance policy has an "other insurance" clause that purports to be excess only and another insurance policy provides for pro rata coverage, "the prevailing judicial view is that imposing the entire liability for a loss on the former 'would annul that policy's language, and create the anomaly that courts will . . . enforce proration

26

between policies [only] when they [both] have conflicting "excess other insurance" language *barring* proration.' " (*Carmel Development*, *supra*, 126 Cal.App.4th at p. 508.) The general rule when multiple policies share the same risk but have inconsistent "other insurance" clauses is to prorate according to each policy's limits. (*Id*. at p. 509.)

National Union argues that *Carmel Development* is directly on point and compels a conclusion that Topa's excess policy was a specific excess policy that attached before National Union's general excess policy. In *Carmel Development*, a dispute arose between two excess insurers, RLI Insurance Company (RLI) and Fireman's Fund Insurance Company (Fireman's Fund). (*Carmel Development*, *supra*, 126 Cal.App.4th at p. 506.) Carmel Development Company (Carmel) was the general contractor on a project constructing golf and residential facilities. Carmel subcontracted with Largo Concrete Company (Largo), which in turn subcontracted with CAB Concrete (CAB). During construction, a CAB employee was severely injured at the worksite. The employee filed a lawsuit against Carmel and Largo and settled against Largo. The lawsuit against Carmel proceeded to a jury trial, and a jury awarded the employee more than $10 million in damages. (*Ibid*.)

Carmel was insured by a commercial general liability policy issued by Reliance Insurance Company (Reliance) and a $10 million excess liability policy from Fireman's Fund. (*Carmel Development*, *supra*, 126 Cal.App.4th at p. 506.) Largo had a primary commercial liability policy with Acceptance Insurance Company (Acceptance) and a commercial umbrella policy with RLI. Reliance settled the employee's lawsuit for $7.25 million, with Reliance paying its policy limit of $1 million and Fireman's Fund paying $6.25 million. (*Ibid*.)

Subsequently, Carmel sued Acceptance and RLI seeking a judicial determination that it was an additional insured under the Acceptance policy and that RLI (as the excess insurer) was required to contribute to the employee's settlement after Acceptance's

27

policy limits were met. (*Carmel Development*, *supra*, 126 Cal.App.4th at pp. 506-507.) Fireman's Fund successfully intervened in the action, and RLI filed a cross-complaint against Carmel, Fireman's Fund, and Reliance. (*Ibid*.) At trial, Fireman's Fund argued that it was an excess insurer just like RLI, and the policies contained irreconcilable " 'other insurance' " clauses. RLI argued that its policy was " 'second level excess' " that applied only when *all* other insurance was exhausted, including the Fireman's Fund policy. (*Id*. at p. 507.) The trial court agreed with Fireman Fund's argument, found that RLI and Fireman's Fund had competing "other insurance" clauses, and concluded that it was appropriate for both of them to contribute to the settlement in proportion to their policy limits. (*Ibid*.)

This court reversed the trial court's decision. We noted that if we limited our analysis to the two competing "other insurance" clauses, we would have agreed with the trial court. The Fireman's Fund's policy stated that " '[i]f there is any (1) Other Insurance . . . this policy shall apply as excess of and not contributory with such Insurance.' " (*Carmel Development*, *supra,* 126 Cal.App.4th at p. 509.) " 'Other Insurance' " was defined in the policy as " 'Insurance, other than Primary Insurance or Insurance which is specifically purchased by the Named Insured to be in excess of the Insurance afforded by this policy, which is available to the Insured and affords coverage for Injury or damage to which this policy applies.' " (*Ibid*.) RLI's "other insurance" clause provided: " 'Whenever the insured is covered by other primary, excess or excess-contingent insurance not scheduled on this policy as scheduled underlying insurance, this policy shall apply on in excess of, and will not contribute with, such other insurance. This policy shall not be subject to the terms, conditions or limitations of such other insurance.' " (*Ibid*.)

We concluded, however, that the language of the insurance policies in question rendered it apparent that RLI and Fireman's Fund were not on the same footing with each

28

other. Fireman's Fund provided that it would provide coverage immediately upon exhaustion of Reliance's policy limits. (*Carmel Development*, *supra*, 126 Cal.App.4th at pp. 510-511.) The Fireman's Fund policy specifically stated that it would "pay on behalf of the Insured those sums in excess of Primary Insurance that the Insured becomes legally obligated to pay as damages." (*Id*. at p. 510.) In other words, the Fireman's Fund's policy was specifically excess to that of the primary insurer, Reliance.

In contrast, the language of RLI's policy obligated RLI to provide coverage only when the limits of both the Acceptance policy and all other available coverage, including primary and excess, were exceeded. (*Carmel Development*, *supra*, 126 Cal.App.4th at pp. 510-511.) "RLI's insuring agreement promised, 'subject to the terms, conditions and exclusions of this policy,' to pay 'all sums which the insured becomes legally obligated to pay as ultimate net loss, because of: [¶] A. Bodily injury and property damage; or [¶] B. Personal injury; or [¶] C. Advertising injury caused by an occurrence which takes place during the policy period . . . .' Under the next paragraph, 'LIMITS OF LIABILITY,' RLI stated that it would be liable only 'for the ultimate net loss in excess of: [¶] 1. the applicable limits of scheduled underlying insurance stated in Item 5 of the Declarations, for occurrences covered by scheduled underlying insurance, plus the limits of any unscheduled underlying insurance which also provides coverage for such occurrences . . . .' [¶] . . . 'Ultimate net loss' represented the amount for which the insured was liable 'after deducting for all other recoveries and salvages,' and it excluded certain payments, fees, and expenses. The term 'scheduled underlying insurance' referred to the policies listed in the 'Schedule of Underlying Insurance,' which (for comprehensive general liability) meant the policy issued by Acceptance. The term 'unscheduled underlying insurance' was defined as 'any insurance policies available to any insured (whether primary, excess, excess-contingent, or otherwise) except the policies listed in the Schedule of Underlying Insurance.' " (*Id*. at p. 510.)

29

Accordingly, we concluded in *Carmel Development* that it was clear from the language of the RLI policy that it offered a different level of coverage to its insured compared with the Fireman's Fund policy. (*Camel Development*, *supra*, 126 Cal.App.4th at p. 514.) It was therefore unnecessary to resort to proration. (*Ibid.*)

Here, like the RLI policy contemplated in *Carmel Development*, the National Union policy provided that National Union would be obligated only after "Other Insurance have been exhausted by the payment of Loss . . . ." The National Union policy specifically defined "Other Insurance" as "a valid and collectible policy of insurance providing coverage for damages covered in whole or in part by this policy." And the Topa excess policy is similar to the Fireman's Fund's policy in *Carmel Development*. Topa's excess policy agreed to "indemnify the insured for the amount of loss which is in excess of the applicable limits of liability, whether collectible or not, of the Underlying Insurance inserted in Item 6 of the Declarations . . . ." Item 6 of the declarations lists, as the general liability policy, the Landmark policy.

Topa, however, argues that the definition of "loss" in its policy is, in effect, an "other insurance" policy. As described above, Topa's policy defined "Loss" as "the sum paid in settlement of losses for which the insured is liable after making deduction for all recoveries, salvages or *other insurance* (other than recoveries under the policy of the Underlying Insurance) whether recoverable or not, and shall include all expenses and 'costs.' " (Italics added.) There is no definition of "other insurance" in the Topa policy.

As National Union notes, a similar argument was rejected in *Fireman's Fund Indemnity Co. v. Prudential Assurance Co.* (1961) 192 Cal.App.2d 492 (*Fireman's Fund*). There, an insurer, whose policy defined " 'ultimate net loss' " to mean " 'the sums paid in settlement of losses for which the Assured is liable after making *deductions for all* recoveries, salvages and *other insurances . . . whether recoverable or not. . . .*' " unsuccessfully argued that this definition constituted a valid " 'other insurance' " clause.

30

(*Id*. at p. 494.)  The appellate court noted that the definition of "loss" that the insurer attempted to construe as an "other insurance" clause referred to insurance which the *primary insurer* could enlist—therefore, if the *primary insurer* could reduce its loss by other insurance, the insurer would get the benefit.  (*Id*. at p. 496.)  Additionally, the insurer was seeking a double benefit from its definition of "loss" by "fix[ing the primary insurer's] ultimate net loss under it and deduct[ing] from its liability all other insurance" and by "fix[ing] its own ultimate net loss under it, claiming the benefit of all other insurance."  (*Ibid*.)  Lastly, enforcement of the provision in the way argued by the insurer could conceivably result in a denial of insurance protection to the insured, since the clause calls for deduction of other insurance *whether recoverable or not*.  (*Id*. at pp. 496-497.)  The appellate court concluded that if "the company would limit its liability by the interposition of 'other insurance,' it should at least define the 'other insurance.' " (*Id*. at p. 501.)

We agree with the analysis set forth in *Fireman's Fund*.  And we find the rationale set forth in *Carmel Development* is applicable here.  Although Topa's definition of "loss" referenced "other insurance," the reference was vague.  There was no definition of what this "other insurance" included.  Additionally, Topa's policy contained specific language that indicated that coverage applied *immediately* once the Landmark policy was exhausted.  In contrast, National Union's "other insurance" clause is clearly written, specifically defining other insurance as "a valid and collectible policy of insurance providing coverage for damages covered in whole or in part by this policy."  And, importantly, National Union's excess policy *expressly* states that coverage will not apply until "the total applicable limits of Scheduled Underlying Insurance have been exhausted by the payment of Loss to which this policy applies and any applicable, Other Insurance have been exhausted by the payment of Loss . . . ."

Based on the foregoing, we also do not find the court erred when it entered summary judgment in favor of National Union.  Topa cannot demonstrate that its policy was the same level excess policy as National Union's.[4]

<h1 style="text-align:center">DISPOSITION</h1>

The judgment is affirmed.  National Union Fire Insurance Company of Pittsburgh, PA is entitled to its costs on appeal.

---

[4] Based on our conclusion that summary judgment was properly entered in favor of National Union because (1) there is no evidence that Kielty or Johnson caused Kielty's injuries and (2) National Union's excess policy was a general excess policy while Topa's excess policy was a specific excess policy, we need not address National Union and Topa's arguments pertaining to whether the Pacific/Johnson subcontract incorporated the insurance provisions of the Advent/Pacific contract.

_____

Premo, J.

WE CONCUR:

_____

Rushing, P.J.

_____

Grover, J.

Advent, Inc. v. National Union Fire Insurance Company of Pittsburgh, PA
H041934

| Trial Court: | Santa Clara County Superior Court<br>Superior Court No. 1-13-CV238904 |
| --- | --- |
| Trial Judge: | Hon. William J. Elfving |
| Counsel for Intervener/Appellant:<br>Topa Insurance Company | MURCHISON & CUMMING<br>Philip H. Thompson |
| Counsel for Defendant/Respondent:<br>National Union Fire Insurance<br>Company of Pittsburgh, PA | McCURDY & FULLER<br>Rosemary J. Springer<br>Kevin G. McCurdy |

Advent, Inc. v. National Union Fire Insurance Company of Pittsburgh, PA
H041934