Filed 8/3/23  Ortega v. Carson Wild Wings CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JASMIN ORTEGA,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CARSON WILD WINGS, LLC,<br><br>    Defendant and Appellant. | B309931<br><br>(Los Angeles County<br>Super. Ct. No. BC677388)<br><br>ORDER MODIFYING OPINION<br><br> [CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on July 31, 2023, be modified as follows:

On page 16, in the Disposition, the second paragraph should read:

Costs on appeal are awarded to Appellant.

This modification changes the judgment.

_____

ROTHSCHILD, P. J.          CHANEY, J.          BENDIX, J.

Filed 7/31/23  Ortega v. Carson Wild Wings CA2/1 (unmodified opinion)
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JASMIN ORTEGA,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CARSON WILD WINGS, LLC,<br><br>        Defendant and Appellant. | B309931<br><br>(Los Angeles County<br>Super. Ct. No. BC677388) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Terry A. Green, Judge.  Affirmed in part and reversed in part.

Troutman Pepper Hamilton Sanders, Keith J. Barnett and Elizabeth Holt Andrews for Defendant and Appellant.

Lebe Law, Jonathan M. Lebe and Zachary T. Gershman for Plaintiff and Respondent.

_____

Jasmin Ortega, a server in a restaurant owned by Carson Wild Wings, LLC (CWW), sued her employer for tort claims and Labor Code violations on a theory of whistleblower retaliation. After a jury trial, the court entered judgment for Ortega and awarded her punitive damages and attorney fees. CWW contends insufficient evidence supports the verdict and damages award, and punitive damages and an award of attorney fees were improper. We conclude insufficient evidence supports the verdict. Accordingly, we affirm the judgment on an undisputed claim but otherwise reverse both the judgment and attorney fee award. We do not reach CWW's other arguments.

## BACKGROUND

### I. Ortega's Employment

CWW owns and operates Buffalo Wild Wings restaurant.

Beginning in 2013 or 2014, Ortega worked at the restaurant as a server. She was well regarded by her peers and CWW's general manager, but in 2015 and 2016 received six corrective action memorandums from her managers and had been suspended once.

On March 6, 2017, Sandra Reisz became the general manager of the restaurant where Ortega worked.

#### A. March 2017: Initial Reisz Investigation

In late March 2017, Shava Willis, a shift manager, notified Reisz that she suspected Ortega of circumventing the restaurant's policy for sharing tips among the staff, and of manipulating a customer loyalty program to take advantage of unused benefits. Reisz initiated an investigation.

2

**B.    March 31 or April 6, 2017:  Waterbombing Incident**

On March 31 or April 6, 2017 (the date was contested), about a month after Reisz became the manager, Ortega "water-bombed" "Tyler," a trainee server, as follows:

CWW's servers used a computer system, called a "Point-of-Sales" (POS) system, to keep track of tables, orders, checks, and tips.  A server would log onto the system, make notations about orders made and filled, and log off.  If a server failed to log off, the next server could make notations concerning the prior server's tables under that server's still-open session.

Waterbombing involved going onto another server's still-open session, opening entries relating to that server's tables, and making notations that water had been ordered when it had not.  The first server would thereafter have to "check out" the water orders, i.e., cancel or mark them as having been filled, before closing out the session.

On March 31 or April 6, 2017, Tyler, a new server, inadvertently failed to log himself out of the POS system near the end of his shift.  To "teach him a lesson," Ortega used Tyler's still-open session to place multiple simultaneous orders for water at his assigned tables to make him think he was responsible for fulfilling a rush of new orders, when in reality no one had ordered anything and indeed, most or all of his tables were empty.  The prank forced Tyler and Reisz to rush to clear the fake water orders before his shift ended.

**C.    April 6, 2017:  Corrective Action Memo**

The waterbombing incident infuriated Reisz.  On April 6, 2017, she drafted a "corrective action" memorandum, dated April 6, 2017, notifying Ortega she was being fired.  The memorandum

stated, "This serves as your . . . Notice of Termination," and gave three reasons:

(1) "On 3/27/17 Jasmin Ortega was caught manipulating the tip out procedure. Ms. Ortega added the total transaction amount plus the tip amount together, inserted said number into the transaction amount line and closed the tip out to cash thereby circumventing the tip tracking system and avoiding the need to pay taxes on the tip";

(2) "On 4/6/17 New server Tyler failed to exit out of his screen on the POS so Jasmin felt the need to 'teach the arrogant new server a lesson.' Jasmin opened 20 tables under Tyler's name. Each table just had a water on the table AKA a 'water bomb.' Jasmin's stunt almost cost us a meal break violation as Tyler only had a few minutes to check out";

(3) "Jasmin has been written up on 3/15/17 for a break violation; on 12/16/16 for tardiness and poor attitude; on 10/19/16 for leaving work without permission; on 10/15/16 for a break violation; on 4/10/16 for a no call no show; on 5/7/15 for disorderly conduct with a guest and on 3/18/15 for poor guest service";

Reisz emailed the memo to CWW's district manager and human resources department, requesting approval to terminate Ortega's employment and asking for her final paycheck to be cut.

Reisz then went home for the day.

### D. April 6 and 7, 2017: Ortega's Complaints Regarding Meal Breaks

Later that evening, Willis, Ortega's shift manager, directed Ortega to clock out for her meal break but work through the break and take one later. At around midnight, Ortega complained to Willis about not receiving a meal break.

4

The next day, on April 7, 2017, Ortega was again told to work through her scheduled meal break. She complained to Devin McLothan, another shift manager, about missed breaks and other wage and hour violations.

### E. April 10, 2017: Termination

On April 9, 2017, in response to Reisz's corrective action memo, CWW suspended Ortega before her shift was to begin.

On April 10, 2017, Reisz presented the corrective action memo to Ortega. The memo bore three signature lines, for the employee, a manager, and a witness. Ortega refused to sign it. Reisz and a witness signed the memo and dated it "4/10/17."

## II. Lawsuit

### A. Complaint

On September 26, 2017, Ortega sued CWW and two of its executives, Edward Barnett, and Karim Webb, alleging: violation of "the whistle-blowing law" pursuant to Labor Code section 1102.5; "retaliation for engaging in a protected activity" pursuant to Labor Code section 98.6; wrongful termination in violation of public policy; intentional and negligent infliction of emotional distress (IIED and NIED); and "failure to produce [Ortega's] personnel file."

The trial court denied two successive CWW motions for summary judgment or adjudication and granted Ortega's unopposed motion for summary adjudication of her cause for failure to produce a personnel file. The matter went to jury trial on Ortega's other causes of action.

### B. Trial

At trial Ortega's theory was that the timing of her complaints about wage and hour violations on April 6 and April 7, 2017, and CWW's decision to fire her on April 10, constituted

5

evidence that the firing was in retaliation for the complaints. CWW had a history of retaliating against employees who ask that the company follow labor laws, she argued, and no important decisions were made without the knowledge and approval of Webb and Barnett, CWW's owners.

Several CWW employees, including Reisz, testified that Ortega was an excellent but troubled employee.

Ortega testified that she was denied meal breaks on April 6 and 7, 2017, and reported these wage and hour violations to her direct managers, Willis and McLothan. Other employees corroborated that missed meal breaks had occurred before at the restaurant. Ortega testified she was suspended soon after making her complaints, and was terminated a couple days later.

Ortega denied that she falsified her tips or manipulated CWW's tip-out procedure, and said CWW had used this same excuse to fire another employee, Erica Bustarde, after she also reported being forced to work off-the-clock.

Ortega testified that her prior write-ups were in the distant past and had nothing to do with her termination, and one was mistaken in any event. She also asserted that CWW failed to follow its progressive discipline policy when terminating her.

Ortega admitted waterbombing Tyler, but testified she did so on March 31, 2017, not April 6, and anyway waterbombing was commonly practiced at CWW to remind new servers to log out of the POS system so the next server would not have to do so. It was never a terminable offense.

Four servers, Bustarde, Yessica Jasper, Julieta Hernandez, and Monesha Sauve, testified that CWW sometimes denied employees their meal breaks.

6

Bustarde, a server at the restaurant when Reisz was the manager, testified she was terminated in July 2017, a week after reporting to the human resources department about having been forced to work off-the-clock. Bustarde testified that CWW provided baseless reasons for her termination, including that she had improperly closed a tab to avoid paying taxes on her tips and had accumulated several prior write-ups.

Jasper testified that waterbombing was neither an unusual nor particularly intrusive or upsetting occurrence. However, she also testified, "You wouldn't do it around the manager." She testified, "I think that is a ridiculous reason to fire someone because if that was the case then they should fire the entire staff, because we all did it." Jasper testified that in 2015 she was terminated after reporting CWW's wage-and-hour violations to shift managers.

No witness testified that Reisz retaliated against them.

For the defense, Willis and McLothan testified that neither Ortega nor anyone else ever missed a meal break, and Ortega never complained about missed meal breaks. They testified they never told Reisz about any meal break issue. Around March 27, 2017, Willis began to suspect that Ortega was skirting the restaurant's tip sharing policy, and reported her suspicion to Reisz.

McLothan testified that Reisz did not know what waterbombing was before Ortega waterbombed Tyler: "[W]e had to explain it to her."

Reisz testified that she considered waterbombing to constitute bullying, deserving termination: "I was very angry. I was upset because I felt like it was just like a slap in the face to the new guy and I was trying very hard where I was hiring and

7

trying very hard to get really good people in the restaurant. And it was, you know, it was a slap in my face. It was a slap in Ty's face. It was—I was upset."

Reisz testified she did not know about any meal break complaint when making the decision to fire Ortega. Without consulting the other managers, she wrote the corrective action memorandum during her shift on April 6, 2017, emailed it to CWW's human resources manager on that date, then went home. This occurred before Ortega could have complained to other managers about missed breaks later that night and the next night. Reisz testified that when she fired Ortega, the server said nothing about having missed meal breaks. She testified that "ultimately the termination occurred [because of] a culmination of things, . . . bullying an employee, having seven write-ups in the file. It was sort of a sum of the whole is greater than the sum of the parts kind of situation."

CWW was unable at trial to substantiate Willis's suspicions about Ortega's tip-sharing violations.

Ortega admitted that Reisz's corrective action memo was dated April 6, 2017, but testified that Reisz "could [have] change[d] the dates" on the termination paperwork to cover her retaliation and create the false impression that she had made her decision before Ortega complained to Willis and McLothan. Ortega also stated, "[I]t was common for [CWW] to alter records." (She offered no support for either allegation.)

Ortega's counsel argued to the jury that CWW failed to produce the email Reisz sent CWW's human resources manager on April 6, 2017, from which the jury should infer that Reisz decided to fire Ortega not after the waterbombing incident but after her complaints to Willis and McLothan.

8

### C.    Verdict and Post-Verdict Proceedings

At the close of evidence, the court granted a directed verdict in favor of Webb and Barnett on the ground that no evidence suggested they had knowledge of the circumstances of Ortega's termination.

The jury found for Ortega on all claims and awarded her $52,000 in past lost earnings, $20,000 in future lost earnings, and $128,000 in past noneconomic loss, including physical pain and mental suffering, for a total of $200,000.

With respect to punitive damages, the verdict form asked whether "CWW" "engage[d] in conduct with malice, oppression, or fraud." The verdict form requested no finding as to any individual agent or employee of CWW.

The jury nevertheless concluded that CWW engaged in conduct with malice, oppression or fraud, and awarded Ortega $100,000 in punitive damages.

On October 27, 2020, the trial court entered judgment for Ortega in the amount of $301,500, comprising the jury award on causes of action that went to trial, plus $1,500 in statutory damages for the undisputed claim involving Ortega's personnel file. The judgment erroneously stated that the jury found that "an agent or employee of Defendant Carson Wild Wings, LLC engage[d] in conduct with malice, oppression, or fraud." As noted, however, the verdict form made no mention of any CWW agent or employee.

CWW moved for judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial, both of which the trial court denied.

On January 5, 2021, the court awarded Ortega attorney fees in the amount of $291,948.00.

9

## DISCUSSION

CWW contends no substantial evidence supports the judgment because uncontested evidence established that Reisz did not know about Ortega's complaints about missed meal breaks when deciding to fire her, and therefore could not have retaliated against her. We agree.

### A. Legal Framework

An employer may not retaliate against an employee for complaining about the employer's noncompliance with any legal obligation or for exercising any right afforded by law. (Labor Code, §§ 98.6, 1102.5, subd. (c).)[1]

A whistleblower employee who has suffered an adverse employment action proves a retaliation claim by establishing by a preponderance of the evidence that retaliation "was a contributing factor" in the adverse action. (§ 1102.6.) After the employee does so, the employer must demonstrate by clear and convincing evidence that it would have taken the same action "for legitimate, independent reasons even if the employee had not engaged in [protected] activities." (*Ibid*.; see *Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal.5th 703, 707 (*Lawson*).)

A section 1102.6 retaliation claim thus proceeds in two stages. "The first prong of the statute . . . tells us what plaintiffs must prove to establish liability, and by what evidentiary standard. Specifically, plaintiffs must show, by a preponderance of the evidence, that whistleblowing was a contributing factor in the employer's decision." (*Lawson, supra*, 12 Cal.5th at p. 712.)

---

[1] Undesignated statutory references will be to the Labor Code.

10

The second prong of the statue codifies the employer's "same-decision defense." (*Ibid*.)

"When a party contends insufficient evidence supports a jury verdict, we apply the substantial evidence standard of review. [Citation.] ' "[T]he power of [the] appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the [verdict]." [Citations.]' [Citation.] We must 'view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor. . . .' " (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1188.)

## B. Insufficient Evidence Supports Causation

Here, no evidence suggested that Ortega's complaining about missed meal breaks was a contributing factor in CWW's decision to fire her. On the contrary, the uncontroverted evidence established that Reisz decided to fire Ortega *before* Ortega complained.

Reisz testified, and other evidence established, that Reisz decided to terminate Ortega in the early evening of April 6, 2017, before Ortega complained to Willis later that evening and to McLothan on April 7. Reisz drafted her notice of corrective action in the early evening and emailed it to a CWW division manager, who approved the termination. She then left work. No evidence suggested that Reisz was at the restaurant when Ortega complained to either Willis or McLothan, or that those supervisors communicated Ortega's complaints to Reisz. On the contrary, the three managers—Reisz, Willis and McLothan—all testified that no one told Reisz about Ortega's complaints, and Reisz testified that Ortega mentioned nothing about them on

11

April 10.  Ortega herself never testified that she told Reisz about her complaints.

It was simply impossible for Reisz to retaliate against Ortega because of a complaint Ortega made after the alleged retaliation.

Ortega purports to derive an inference of retaliation from a partial sequence of events:  She complained to Willis on April 6, 2017, and to McLothan on April 7, and was fired on April 10. However, Ortega ignores the determining part of the sequence: Reisz *decided* to fire Ortega early on April 6, 2017, before Ortega complained to Willis, and the termination on April 10 proceeded directly from that April 6 decision.  No evidence suggested, for example, that between April 6 and 10 Reisz changed her mind about firing Ortega, then learned about her complaints and changed it back.

Because no evidence suggests that Reisz knew about Ortega's complaints even as late as April 10, 2017, when Reisz presented her with the termination papers, the sequence of events by itself failed to fulfill Ortega's burden of showing retaliation was a contributing factor in Ortega's termination.

Ortega argues that her testimony that the waterbombing happened earlier than the date stated in Reisz's memo (i.e., on March 31, 2017, rather than April 6) constituted substantial evidence that "the timeline on the termination memo was incorrect."  We disagree.  The relevant timeline concerns the date of the memo itself, not the dates it recites.  A discrepancy in the memo's recitation of dates does not refute the unrebutted evidence that Reisz wrote the memo before Ortega complained about missed meal breaks.

12

Ortega relies on her testimony that Reisz "could [have] change[d] the dates" on the corrective action memorandum to conceal her retaliatory motive and create the false impression that she made her decision before Ortega complained to Willis and McLothan. Ortega also testified "it was common for [CWW] to alter records."

But no evidence or explanation supported these assertions. Bare speculation is not evidence. (*Advent, Inc. v. National Union Fire Ins. Co. of Pittsburgh, PA* (2016) 6 Cal.App.5th 443, 459; *Wiz Technology, Inc. v. Coopers & Lybrand LLP* (2003) 106 Cal.App.4th 1, 11.)

Ortega argues that Reisz's failure to produce the email she sent to CWW's human resources manager on April 6, 2017, supports an inference that the email was sent later, i.e., after Ortega complained to Willis and McLothan. (See Evid. Code, § 412 [failure to produce strong evidence supports the inference that weaker evidence on the same issue is untrustworthy].) But Ortega adduces nothing in the record suggesting CWW was called upon to produce the email. In any event, Reisz sending the email later than April 6, 2017, would not establish that she falsified the date on the corrective action memorandum itself. Nor would it establish that she knew about Ortega's complaints before sending the memo.

## C. Pretext Alone Does Not Establish Causation

Ortega glosses over the causation timeline, instead asserting that Reisz's pretextual justifications for firing her, and CWW's alleged "culture of retaliation," constitute evidence of retaliation.

In this vein, Ortega argues the reasons Reisz gave for firing her were false, because: (1) Ortega did not violate CWW's tip-out

procedure; (2) other employees had not been terminated for waterbombing severs; (3) the waterbombing here occurred on March 31, 2017, not April 6, 2017; and (4) progressive discipline for her prior misconduct had resolved CWW's concerns about that conduct. Ortega also relies on the testimony of several servers that CWW denied employees their meal breaks, terminated servers after they complained, and gave pretextual reasons for doing so. She argues that this evidence established that CWW maintained a "retaliatory culture," which shifted the burden to CWW to show it had a "legitimate, nonretaliatory" reason for firing her.

We disagree.

First, pretext alone does not establish retaliation. "[A] plaintiff's showing of pretext, *combined* with sufficient prima facie evidence of an act motivated by discrimination, *may* permit a finding of discriminatory intent . . . ." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 361 (*Guz*).) Here, Ortega adduced no evidence of an act motivated by retaliation. Her only evidence was the sequence of events. But as discussed, the sequence fails: Even if Reisz's stated reasons for firing Ortega were false, and even if she generally participated in CWW's "retaliatory culture," no evidence suggests either that Reisz knew about Ortega's complaints or wrote the termination memo after she made them.

Second, although when an employer gives a pretextual reason for an adverse employment action it is reasonable to infer the true reason was impermissible, that inference arises only when other, legitimate reasons have been eliminated. (See *Guz, supra*, 24 Cal.4th 317, at p. 381 (conc. & dis. opn. of Kennard, J.) " '[W]e know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying

14

reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, whom we generally assume acts with some reason, based his decision on an impermissible consideration such as race [or age].' " (*Ibid*.)

Here, Ortega failed to show that waterbombing could be eliminated as a legitimate reason for her termination. None of the testimony suggesting that other CWW employees tolerated waterbombing established that *Reisz* tolerated it, or that she participated in CWW's retaliatory culture. On the contrary, McLothan testified that Reisz was unaware of the waterbombing practice before he explained it to her, and Reisz testified she considered waterbombing to be bullying. And none of the servers' complaints about CWW's unfair actions respecting them mentioned Reisz as the actor. Because the evidence failed to eliminate all possible legitimate reasons for terminating Ortega's employment, it fails to support an inference that it was more likely than not Reisz based her decision on an impermissible consideration.

## D.    Conclusion

In sum, unrebutted evidence that Reisz did not know about Ortega's complaints, and drafted her corrective action memorandum before she made them, established that Reisz could not have retaliated against Ortega because of the complaints.

The jury's finding that Reisz retaliated against Ortega, and therefore its verdict, were thus unsupported by substantial evidence.

## E. Other Contentions

CWW raises several further arguments: (1) No substantial evidence supports any other cause of action; (2) punitive damages were improper because the jury never found that CWW's managing agent acted with malice, fraud, or oppression; (3) the damages award was unsupported by substantial evidence; and (4) the attorney fees award was improper.

We need not reach these arguments. Each of the causes of action that went to trial was predicated on retaliation. For example, Ortega alleged no severe emotional distress resulting from anything other than CWW's retaliation, and no wrongful termination other than in retaliation to her meal break complaints. Given our conclusion that no evidence supported Ortega's claim of retaliation, those other causes of action were similarly unsupported. The judgment as to all causes of action that went to trial must therefore be reversed, along with the damages and attorney fee awards.

## DISPOSITION

The judgment is affirmed insofar as it awards Ortega $1,500 on her cause of action for failure to produce her personnel file. Otherwise, the judgment, along with the damages and fee awards, are reversed.

Respondent is to recover costs on appeal.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

ROTHSCHILD, P. J.          BENDIX, J.

16